United States Court of Appeals,

Fifth Circuit.

No. 94-10794.

TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, f/k/a Texas
Housing Agency, Plaintiff-Appellant,

v.

VEREX ASSURANCE, INC., et al., Defendants, Verex Assurance, Inc.,
Defendant-Appellee.

Nov. 9, 1995.

Appeal from the United States District Court for the Northern
District of Texas.

Before HIGGINBOTHAM and PARKER, Circuit Judges, and BROWN[*],
District Judge.

ROBERT M. PARKER, Circuit Judge:

Plaintiff Texas Department of Housing and Community Affairs
appeals the district court's judgment in favor of Defendant Verex
Assurance, Inc. We affirm in part, vacate in part, and remand.

## I. BACKGROUND

The plaintiff, Texas Department of Housing and Community
Affairs, formerly known as Texas Housing Agency ("THA"), is an
official governmental agency of the State of Texas. THA was
created to provide mortgage financing to low to moderate income,
first-time home buyers. THA does not originate or underwrite
loans, but instead contracts with certain lenders to do so
according to THA's guidelines.

Norwest Mortgage, Inc. and the Charles Curry Company, both

[*]District Judge of the Eastern District of Texas, sitting by
designation.

mortgage lenders, entered into an "Origination, Sale, and Servicing Agreement" with THA, whereby Norwest and Curry agreed to originate certain loans, sell them to THA, and service them on behalf of THA. Under this agreement, Norwest made two loans relevant to this appeal: one to Jimmy and Queenie Anderson and one to Theodore Newhouse, both in connection with the purchase of real property in Fort Worth, Texas. Also relevant to this appeal, Curry made a loan to Jeffrey and Chris Abbott in connection with the purchase of real property in Arlington, Texas.

THA's guidelines required Norwest and Curry to obtain private mortgage insurance on each loan originated. To comply with this guideline, Norwest and Curry obtained pre-qualification from Defendant Verex Assurance, Inc., a private mortgage insurer, in the form of master policies for insurance. The master policies gave Norwest and Curry the ability to apply for mortgage insurance from Verex on individual loans. These master policies provided that in return for the payment of premiums, and after review and approval of the application for mortgage insurance on a particular loan, Verex would insure the loan against default by the borrower.[1]

As the applications and supporting documents on the Anderson, Newhouse, and Abbott loans were collected, Norwest and Curry submitted them to defendant Verex with applications for mortgage insurance. The documents submitted to Verex regarding the Anderson

---

[1]The policies at issue in the present case covered 25% of the amount due the insured in the event of loss. Plaintiff THA was also insured against loss under a pool insurance policy from Verex which is not at issue in the present case.

2

loan indicated that the sales price and appraised value of the property was $29,000 and that the principal amount of the new loan was $27,500. The documents submitted regarding the Newhouse loan indicated that the sales price and appraised value of the property was $26,000 and that the principal amount of the new loan was $24,700. With regard to the Abbott loan, the documents indicated that the sales price was $65,950, the appraised value was $66,000, and the principal amount of the new loan was $62,650. The loan documents also indicated the size of the down payments the purchasers were to make, and contained representations regarding the source of the money that would be used to make the down payments.

Based on its review of these documents, Verex agreed to provide mortgage insurance on the Anderson, Newhouse, and Abbott loans and thus issued commitments for insurance on the respective loans to Norwest and Curry. The certificates of insurance identified the loans being insured and indicated the terms of the transaction, including the loan amount, sales price, appraised value, and the loan-to-value ratio.[2] A Certificate of Insurance was attached to each commitment for the lender's representative to sign and return with the appropriate premium after the transaction was consummated. Each of the loans was consummated, and the required premiums were tendered to Verex. Shortly after each loan was consummated, it was transferred to THA along with an assignment

---

[2]Loan-to-value ratio is defined in the industry as the loan amount divided by the lesser of the sales price or appraised value of the property in question.

of the insurance policies obtained from Verex. Each of the loans defaulted. At the time of the defaults, plaintiff THA was the holder of the mortgage loans. Notice of default was properly given, and claims were filed with Verex within the time allowed by the master policies.

As a result of the claims for coverage, Verex began an investigation which included investigating the accuracy of the representations made on the documents tendered to Verex by Norwest and Curry. Based on the discovery of certain misrepresentations, Verex denied coverage. Consequently, Verex did not pay any amounts on the claims for coverage on the Anderson, Newhouse, and Abbott loans. Instead, Verex notified THA that it was rescinding the individual mortgage insurance policies. Verex re-tendered to Norwest, Curry, and THA all premiums tendered to it for insurance on these three loans.

In 1989, THA filed suit against Verex and GMAC Mortgage Company, a party subsequently dismissed from the lawsuit, in state court in Travis County, Texas. GMAC removed the action to the United States District Court for the Western District of Texas based on diversity of citizenship. Verex joined in GMAC's Notice of Removal and filed a Motion to Transfer Venue and Brief in Support to have the case transferred to the Northern District of Texas. That motion was granted.

The case was tried to the court on plaintiff THA's Third Amended Complaint beginning May 31, 1994. THA asserted causes of action for breach of contract and violation of the Texas Deceptive

4

Trade Practices Act, and requested attorneys' fees. Defendant Verex asserted, *inter alia,* the defenses of conditions precedent, fraudulent or negligent misrepresentation, and mutual mistake of fact. The district court granted judgment as a matter of law against THA on its DTPA claims. In addition, during the trial, the district court held that Verex had not given proper notice under § 21.17 of the Texas Insurance Code of the misrepresentations related to the Anderson and Newhouse loans, and that as a result the misrepresentation defense as to those two loans was statutorily barred. The district court took the remaining claims and defenses under advisement.

On June 30, 1994, the district court entered an opinion and order in favor of defendant Verex. Specifically, the district court held that under Texas law the sales prices, appraised values, and loan-to-value ratios reflected in the commitments for insurance issued by Verex were conditions precedent to the formation of the insurance contracts in question. The district court found that because down payments had not been made as represented, the sales prices were lower than represented and thus the loan-to-value ratios exceeded the specified limit. Therefore, the court held, certain conditions precedent had not been met, and THA was not insured for default on the loans in question. THA's claims were dismissed with prejudice, and this appeal followed.

## II. ANALYSIS

### A. SUBJECT MATTER JURISDICTION

For the first time on appeal, THA argues that the district

court did not have jurisdiction to decide the present case. Before this Court can reach the merits of an appeal, we must determine that the district court had subject matter jurisdiction over the case. *Ziegler v. Champion Mortgage Co.,* 913 F.2d 228, 229 (5th Cir.1990). This action was removed to federal district court on the basis of federal diversity jurisdiction under 28 U.S.C. § 1332. In an action where a state is a party, there can be no federal jurisdiction on the basis of diversity of citizenship because a state is not a citizen for purposes of diversity jurisdiction. Likewise, state agencies that are the alter ego of the state are not citizens for the purposes of diversity jurisdiction. "On the other hand, if the agency is an independent one, separate and distinct from the state, the district court can properly proceed to the merits." *Tradigrain, Inc. v. Mississippi State Port Authority,* 701 F.2d 1131, 1132 (5th Cir.1983). THA now contends that it is the alter ego of the State of Texas.

In determining whether the agency is an alter ego of the state or an independent agency, the essential question is whether the state is the real party in interest in the lawsuit. The resolution of this question is a matter of state law.

* * * * * *

If the agency's status is unclear, the court must look to any and all available sources for guidance. The court should consider whether the agency has been granted the right to hold and use property, whether it has the express authority to sue and be sued in its corporate name, the extent of its independent management authority, and "a factor that subsumes all others," the treatment of the agency by the state courts. When examining the extent of the agency's independent management authority, the court should look to whether the agency has the power to make its own hiring decisions, the power to enter into its own contracts, and the power to engage its own counsel. When examining the treatment of the agency

6

by the state courts, this court has taken note of the fact that the state has sued the agency in its own courts, and of a state court holding that the statute of limitations, which did not normally run against the state itself, ran against the agency. Other relevant factors might include: (1) whether the state is responsible for the agency's debt; (2) whether the agency is primarily concerned with local, as opposed to statewide problems; and (3) the degree of general financial autonomy of the agency. The source material for the court's analysis is found in the state's constitutional, statutory and decisional law.

In a typical situation, some factors will suggest that the agency is a "citizen" while others will just as strongly suggest that the agency is merely an alter ego of the state. The court must balance these against each other in reaching its conclusion. It must never, however, lose sight of the primary question involved: whether the state is the real party in interest in the lawsuit nominally brought [by or] against the agency.

*Tradigrain,* 701 F.2d at 1132-33 (internal citations omitted).

We note that there is nothing in the Constitution of the State of Texas or the State's case-law which directly addresses THA's status. Therefore, we begin our inquiry with the agency's enabling statute. Tex.Rev.Civ.Stat.Ann., Art. 1269*l*-6 (West 1987)[3]. THA concedes that under the enabling statute in effect at the time of removal to federal court it had the right to hold and

---

[3]The Texas Housing Agency Act, Tex.Rev.Civ.Stat.Ann., Art. 1269*l*-6 (West 1987), expired September 1, 1991, by its own terms. The Texas Housing Agency and the Texas Department of Community Affairs were abolished and their powers were transferred to the Texas Department of Housing and Community Affairs by Tex. Acts 1991, 72nd Leg., ch. 762, § 1, and the statutes that governed the abolished agencies were amended and transferred to a new statute, Tex.Civ.Stat.Ann., Art. 4413(501) (West 1992), effective September 1, 1991. This statute was repealed by Tex. Acts 1993, 73rd Leg., ch. 268, § 46(1) and its provisions were amended and recodified at Tex.Gov't Code Ann. § 2306.001, *et seq.* (West Supp.1995), effective September 1, 1993. However, our determination of THA's status for purposes of removal jurisdiction depends on the enabling statute that was in effect at the time the action was commenced and removed. *See Jackson v. Allen,* 132 U.S. 27, 10 S.Ct. 9, 33 L.Ed. 249 (1889).

use property, and the right to sue and be sued in its corporate name, and that the State of Texas was not responsible for the agency's debts. In addition, Verex points out that THA was responsible for issuing its own bonds, preparing its own budget, and handling its own finances. THA also had the power to make contracts, adopt by-laws, maintain offices, and make employment decisions. Thus, under the enabling statute, THA was granted some of the generally recognized powers of an independent agency. *See Tradigrain,* 701 F.2d at 1133.

Nevertheless, THA argues that it should be considered the alter ego of the state. In support of this contention, THA points out that the agency's directors are appointed by the governor and that the director chosen to serve as chairman does so only at the governor's pleasure. In addition, the agency is required to file its annual budget and an audit of its books and accounts with the governor and the state legislature each fiscal year. The enabling statute also exempts the income and property of the agency from taxation by the state and all public agencies. However, THA fails to explain how these provision make it the alter ego of the State rather than an independent agency. THA also points out that it is authorized to request and accept appropriations of the state legislature. However, it is clear that under the enabling statute, the legislature is not required to make such appropriations, nor is the state treasury required to provide funds for the agency's debts

or operations.[4]

Finally, THA claims that the language of the enabling statute creating the Texas Housing Agency clearly indicates that it is the alter ego of the State.  Section 3(a) of Art. 1269*l*-6 provides

> There is hereby created and established a public and official governmental agency of the state, to be known as the Texas Housing Agency, and the state shall act by and through the agency in carrying out all the powers and duties conferred by this Act.  The exercise by the agency of all powers and duties conferred by this Act shall constitute and be deemed and held to be an essential public and official governmental function and purpose of the state, acting by and through the agency, in promoting the general welfare and prosperity of the state and all its citizens.

This provision, however, merely serves to confirm what is conceded, that THA was created by the State of Texas to exercise its authority and discretion in performing certain functions on behalf of the state.  THA argues that such language was crucial to our holding in *Tradigrain* that the Mississippi State Port Authority was the alter ego of the State of Mississippi.  However, the language of the Mississippi statute also indicated the legislature's intention that the port authority enjoy sovereign immunity except to the extent of liability insurance carried.  In addition, the

---

[4]THA also argues that it "has the authority to issue bonds that are the general obligation of the State."  Art. 1269*l*-6, § 21(a).  However, THA does not cite § 48 of the same enabling statute which provides that "Subsection (a) of Section 21 of this Act, to the extent it authorizes the issuance of general obligation bonds, takes effect if and when the Texas Constitution is amended to permit the issuance of such bonds as contemplated by that provision of this Act."  THA does not address if or when the Texas Constitution was amended to make § 21(a) effective, but acknowledges that THA is limited to issuing bonds permitted by the Constitution of the State of Texas.  Because we have not located any provision of the Texas Constitution allowing THA to issue general obligation bonds, we will not consider this apparently contingent agency power.

statute provided that the title to any property acquired by the port authority vested in the State of Mississippi and that the bonds issued to provide funds for the port authority became the general obligations of the State of Mississippi.

THA's argument, essentially, focusses on the aspects of its creation and existence that make it an agency of the State of Texas. Although there are, necessarily, many ties between THA and the State, this would be true with any state created agency no matter how independent. One factor that weighs in favor of a finding that THA is the alter ego of the state is that the agency was concerned with a problem that was statewide rather than primarily local. However, the fact that the agency had the authority to hold and use property, the authority to sue and be sued in its corporate name, the power to enter into its own contracts, and the power to make its own hiring decisions, and the fact that it managed its own finances and was responsible for its own debts weigh in favor of finding that THA is an independent agency. Given THA's relative independence in controlling its operations and managing its finances, we hold that the state was not the real party in interest, and that THA is indeed a citizen for purposes of our diversity jurisdiction.

B. CONDITIONS PRECEDENT UNDER TEXAS LAW

Because the district court's jurisdiction in this case was based on diversity of citizenship, it correctly held that it was bound to apply the substantive law of the State of Texas under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed.

10

1188 (1938). In ascertaining the law of the forum state, a federal court "is bound to apply the law as interpreted by the state's highest court." *Ladue v. Chevron U.S.A., Inc.,* 920 F.2d 272, 274 (5th Cir.1991). However, a decision by an intermediate appellate state court "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

To succeed with the affirmative defense of conditions precedent, the defendant must establish (1) that the contract creates a condition precedent, and (2) that the condition precedent was not performed. Conditions precedent are those acts or events that must occur before a contract arises or before performance under an existing contract is required. In other words, conditions precedent may "relate either to the formation of contracts or to liability under them." *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). "When a promise is subject to a condition precedent, there is no liability or obligation on the promisor and there can be no breach of the contract by him until and unless such condition or contingency is performed or occurs." *Reinert v. Lawson,* 113 S.W.2d 293, 294 (Tex.Civ.App.—Waco, 1938, no writ).

THA contends that the contracts for insurance in question did not contain conditions precedent, and, in the alternative, that the district court's finding that the conditions weren't met is clearly

11

erroneous.  We will address these arguments in order.

In order to determine whether a condition precedent exists, the intention of the parties must be ascertained;  and that can be done only by looking at the entire contract.  In order to make performance specifically conditional, a term such as "if", "provided that", "on condition that", or some similar phrase of conditional language must normally be included.  If no such language is used, the terms will be construed as a covenant in order to prevent a forfeiture.  While there is no requirement that such phrases be utilized, their absence is probative of the parties['] intention that a promise be made, rather than a condition imposed.

In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible.  When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition.  Because of their harshness in operation, conditions are not favorites of the law.

*Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990) (internal citations omitted).  Contracts for insurance are generally subject to the same rules of construction as are other contracts and will be enforced as written where the wording used can only be given one reasonable interpretation.  Ambiguous insurance contracts, however, will be interpreted against the insurer.  *National Union Fire Ins. Co. v. Hudson Energy Co., Inc.,* 811 S.W.2d 552, 555 (Tex.1991).

The master policies issued by Verex to each lender, and the commitments for insurance and certificates of insurance issued on the individual loans make up the contracts between THA and Verex.[5] The master policies begin with the language "Verex ... agrees to

---

[5]The district court held that these documents taken together constituted the relevant contracts and that the master policies and commitments were not merged into the certificates of insurance.  THA does not challenge this holding on appeal.

pay ... any loss by reason of the default in payments by a borrower ... subject to the following conditions...."  Among the listed conditions were the following:

1. APPLICATION AND COMMITMENT—The insured shall furnish the Company with an Application in connection with each mortgage loan for which coverage under this policy is desired....  Approval of the Application ... shall be in the form of a Commitment prescribing the terms of the coverage.

2. NOTICE AND CERTIFICATE—Within five (5) days after consummation of the mortgage loan transaction the insured shall forward notice thereof to the Company ... and the Company shall immediately issue and forward a Certificate to the insured, binding the Company according to the terms and conditions of the Commitment and of this policy.

*   *   *   *   *   *

4. TERMINATION BY COMPANY—The Company shall remain liable under this policy with respect to such Commitments or Certificates issued to the insured, as long as the terms and conditions herein contained are fully complied with.

   The commitments issued on each of the mortgages state:

   your application has been examined, and the Company hereby issues to you a Commitment for Insurance and tenders you a Certificate of Insurance for the loan herein described pursuant to the terms and conditions of your Verex Assurance, Inc. Master Policy, identified below, under the following terms and conditions....

Beneath this language on each of the commitments appeared information identifying the loan and the terms of the coverage. The certificates of insurance contained less information, but similarly identified the insured loan and indicated that the coverage was "subject to the terms and conditions of the Master Policy specified below."

The specific "terms and conditions" Verex claims are conditions precedent to coverage under the contracts for insurance are the sales price, appraised value, and the required

13

loan-to-value ratio.  Although there are no reported opinions of the Texas Supreme Court which address precisely the type of contract in question, at least one Texas Court of Appeals has held that these terms and conditions did constitute conditions precedent to coverage.  In *Life Insurance Company of the Southwest v. Verex Assurance, Inc.,*[6] the court held that the sales price, loan amount, and loan-to-value ratio were preconditions to coverage under the insurance policy.  THA argues, however, that we should not follow this intermediate appellate court decision because it is clear that the Texas Supreme Court would decide differently.  *See Ladue,* 920 F.2d 272.  We disagree.

The Texas Supreme Court has said that "[i]n order to make performance specifically conditional, a term such as "if', "provided that', "on condition that', or some similar phrase of conditional language must normally be included."  *Criswell,* 792 S.W.2d at 948.  In the present case, the master policy clearly indicated that Verex intended to be bound only "according to the terms and conditions of the Commitment and of this policy."  The critical information regarding the value of the property and the loan-to-value ratio was printed on the commitment immediately below language that stated that the commitment was issued "under the following terms and conditions."  Although these phrases do not mirror those specifically listed in *Criswell,* we believe they do constitute the type of conditional language the Texas Supreme Court would find sufficient to create a condition precedent.  Indeed, the

_____

[6]810 S.W.2d 416 (Tex.Ct.App.—Dallas, 1991, no writ).

14

conditional language employed by Verex is susceptible of no reasonable construction other than that the parties intended that the policy stand or fall on the literal truth or falsity of the described terms. *Lane v. Travelers Indem. Co.,* 391 S.W.2d 399, 402 (Tex.1965). Therefore, we will follow the holding of the Texas Court of Appeals in *Life Insurance Co. of the Southwest* and hold that the sales prices, appraised values, and loan-to-value ratios specified in the contracts for insurance in the present case constituted conditions precedent.

THA contends, however, that even if the specified terms constituted conditions precedent, the district court's finding that they failed is clearly erroneous. With regard to the Anderson loan, the district court found that the Andersons made no down payment to the seller, and that as a result the sales price was less than specified. The fact that the sales price was less than specified also caused the actual loan-to-value ratio to exceed 95%. With regard to the Newhouse loan, the district court found that the down payment made to the seller was exaggerated by $1,050.00, and that as a result the sales price was lower than specified. As with the Anderson loan, the district court found that the loan-to-value ratio exceeded 95%.

Jimmy Anderson testified that he made no down payment. Theodore Newhouse testified that he paid only $250 as a down payment. In addition to the loan amounts, the respective sellers were to receive down payments of $1500 and $1300 as a part of the specified sales price. Nothing in the record indicates that the

15

respective sellers received these down payments from or on behalf of Anderson or Newhouse. On this record, the district court was justified in concluding that the respective sellers did not in fact receive the specified sales price, and that because the real sales price was lower than represented, the actual loan-to-value ratio was greater than the 95% specified. These findings show the failure of conditions precedent, and we cannot say that they are clearly erroneous. Thus, the district court's judgment with regard to THA's claims on the Anderson and Newhouse loans must be affirmed.

With regard to the Abbott loan, the district court found that the borrowers made a down payment of only $3,192.50. THA contends that this finding has no support in the record. According to the district court's opinion, this amount was revealed by Verex's investigation. However, it is not apparent from the record how the district court arrived at this figure. Indeed, on appeal Verex offers no support for the district court's calculation. Finding no support in the record, we agree with THA that this finding must be deemed clearly erroneous.

Verex contends, however, that a portion of the Abbotts' down payment was borrowed from Chris Abbott's employer, and that the sales price and loan-to-value ratio conditions precedent failed as a result. We may assume without finding that a portion of the Abbotts' down payment was borrowed. Verex's argument assumes rather than explains a logical or definitional relationship between the source of the borrower's down payment and the sales price

16

received by the seller. On the other hand, THA contends, without dispute, that the seller in this transaction in fact received the represented down payment, whether or not a portion of that amount was borrowed.

The evidence regarding the Anderson and Newhouse loans supported a finding that the required down payments were not made to the sellers from any source. Rather, the evidence indicated that the sellers accepted less than the specified sales price as a result of the reduced or nonexistent down payments. This evidence supported the conclusion that the sales price and loan-to-value ratio conditions precedent failed as to the insurance coverage on those loans. The same conclusion does not follow from the evidence regarding the Abbott loan.

It apparently is undisputed that the seller in the Abbott transaction actually received $65,950.00, the specified sales price for the subject property. The fact that Chris Abbott obtained a portion of the required down payment by borrowing it from his employer does not change that fact so as to somehow create a failure of the sales price or loan-to-value ratio conditions precedent. In other words, the source of the borrower's down payment is not an inherent element of the sales price or loan-to-value ratio conditions precedent expressed in the insurance policy. The loan application signed by the Abbotts, and thus the documents provided to Verex, contained a representation that the source of the down payment was to be "cash assets" of the borrowers and that no part of the down payment was borrowed. This, however,

17

is not sufficient to make the source of the borrowers' down payment a condition precedent to the insurance coverage. Therefore, the district court's judgment with regard to the Abbott loan cannot be affirmed on this basis.

C. MUTUAL MISTAKE

As an alternative basis for affirming the district court's judgment, Verex urges on appeal the affirmative defense of mutual mistake. "Ordinarily, a mutual mistake sufficient to justify rescission exists when both of the parties are laboring under the same misconception as to a common fact, as ... when the parties contract on the assumption of a matter material to the contract but not expressed in it, and their common assumption is incorrect." *Volpe v. Schlobohm,* 614 S.W.2d 615, 617-18 (Tex.Civ.App.—Texarkana, 1981, no writ). "The mistake must relate to the subject matter of the contract involved and not to a matter that is collateral or incidental to that contract." *Durham v. Uvalde Rock Asphalt Co.,* 599 S.W.2d 866, 870 (Tex.Civ.App.—San Antonio, 1980, no writ).

Application of the defense of mutual mistake in this case is complicated by the fact that two distinct contracts were involved in each transaction: the contract between the borrower and the lender and the contract between the lender, and its assigns, and the insurer Verex. *See Durham,* 599 S.W.2d at 870. We do not read Texas law to rule out application of the defense in this context. However, the relevant inquiry must be framed very carefully. With regard to the Abbott loan in particular, the question must be whether the borrowers' representations in their loan application

18

that the down payment was to come from "cash assets" and that no part of the down payment was borrowed became mutual incorrect assumptions material to the substance of the contract for insurance between Curry and Verex.

Because of its disposition, the district court did not address this alternative defense and, therefore, did not make sufficient findings of fact to allow this Court to conduct an appropriate review. Thus, with regard to Verex's liability on the Abbott loan a remand is required.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED** as to THA's claims regarding the Anderson and Newhouse loans, **VACATED** as to THA's claims regarding the Abbott loan, and **REMANDED** for further proceedings consistent with this opinion.