Robin **FREE** and Renee Free

v.

**ABBOTT LABORATORIES,** Bristol–Myers Squibb Company, Mead Johnson & Company.

No. CIV. A. 93–971–A.

United States District Court, M.D. Louisiana.

Nov. 6, 1997.

Patrick Wayne Pendley, A Professional Law Corp., Plaquemine, LA, Michael D. Hausfeld, Daniel A. Small, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Eric L. Olson, Daniel E. Gustafson, Kent M. Williams, Renae D. Steiner, Heins Mills & Olson, P.L.C., Minneapolis, MN, Howard J. Sedran, Jonathan Shub, Donald E. Haviland, Levin Fishbein Sedran & Berman, Philadelphia, PA, Don Barrett, Don Barrett Law Offices, Lexington, MS, Gordon Ball, Knoxville, TN, for Plaintiffs.

William R. D'Armond, James P. Dore, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, Phillip A. Wittman, John M. Landis, Edwin H. Neill, III, Stone, Pigmann, Walther, Wittman & Hutchinson, New Orleans, LA, James Andrew Langan, Frank Cicero, Jr., Leslie M. Smith, Kirkland & Ellis, Chicago, IL, for Defendant Abbott Laboratories, Inc.

Phillip A. Wittman, John M. Landis, Edwin H. Neill, III, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, LA, Douglas D. Broadwater, Max R. Shulman, Cravath, Swaine & Moore, New York City, for Defendants Bristol–Meyers Squibb Co., Inc. and Mead Johnson & Co.

## RULING ON MOTIONS TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

JOHN V. PARKER, Chief Judge.

This matter is before the court on motions to dismiss, or in the alternative, for summary judgment by defendants, Bristol–Myers–Myers Squibb Company and Mead Johnson & Company. Also pending is a motion to dismiss by defendants, Abbott Laboratories. Because Abbott Laboratories adopts the memoranda filed on behalf of Bristol–Myers and Mead Johnson, the court will address the motions by referring to defendants collectively. Removal jurisdiction is based upon 28 U.S.C. § 1332. In a prior ruling this court held that there is diversity of citizenship jurisdiction in this case which ruling was affirmed, although the court's attempt to remand the action to state court on the grounds of comity was reversed. See *In re Abbott Laboratories,* 51 F.3d 524 (5th Cir. 1995).

### Background

On October 14, 1993, plaintiffs filed this action seeking damages for economic loss including treble damages, attorney fees, and legal interest, The plaintiffs allege that defendants entered a conspiracy to fix prices in violation of Louisiana's antitrust law, La. R.S. 51:122 et seq. Specifically, plaintiffs allege "an understanding and concert of action among defendants, the substantial terms of which were to raise, fix, maintain and stabilize at artificially high levels the wholesale price of infant formula sold in the United States, including the state of Louisiana." Plaintiffs purportedly filed this lawsuit on behalf of themselves and a class of consumers who purchased one or more of defendants' brands of infant formula in the state of Louisiana at any time during the period of January 1, 1980 through December 31, 1992.

On February 23, 1996, defendants Bristol–Myers and Mead Johnson moved to dismiss

plaintiffs' claims or alternatively for summary judgment. Subsequent to the filing of the motion by defendants, plaintiffs entered into settlement agreements with defendants. The court tentatively certified a class for settlement purposes only. On December 16, 1996, on a motion by plaintiffs, this court held a fairness hearing concerning final approval of the settlement agreements. After careful consideration of the matter, the court, on January 21, 1997, denied the motion by plaintiffs for final approval of settlements. 953 F.Supp. 751.

Subsequently, the court denied defendants' motion for reconsideration regarding final approval of the settlements and ordered all parties to submit additional evidence and briefs on the pending motions to dismiss, or in the alternative for summary judgment.

Defendants move to dismiss plaintiffs' claim under Louisiana Antitrust Law, La. R.S. 51:122 et seq. on the basis that 1) indirect purchasers lack standing under La. R.S. 51:122 et seq. and 2) La. R.S. 51:122 only applies to intrastate, and not interstate, conspiratorial conduct. Defendants also move to dismiss plaintiffs' claims for failure to state a claim under La. Civil Code articles 2315 [1] and 1953.[2] Each will be addressed respectively.

## Discussion

The court may not grant defendants' motion to dismiss for failure to state a claim unless it is clear that the plaintiffs can prove no set of facts consistent with the allegations of the complaint which would entitle them to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). It is well established that the court must accept the factual averments as true, and view them in the light most favorable to the plaintiff. *Rankin v. City of Wichita Falls,* Tex., 762 F.2d 444 (5th Cir.1985).

### Dismissal Under Louisiana Antitrust Law

■ To determine whether the complaint reveals facts which would foreclose recovery as a matter of law, the court must apply Louisiana substantive law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (holding that a federal court sitting in a diversity case in which there exists no applicable substantive federal statutory or constitutional law must apply relevant state substantive laws). In applying the substantive law of Louisiana, we recognize that civilian jurisdictions, such as Louisiana, follow the theory of jurisprudence constante.[3] Federal law (which obviously binds this federal court) mandates that a federal court sitting in diversity determine state law by looking to the case law of the highest state court. *Texas Dept. of Housing and Community Affairs v. Verex Assurance, Inc.,* 68 F.3d 922, 928 (5th Cir.1995), citing *Ladue v. Chevron U.S.A., Inc.,* 920 F.2d 272, 274 (5th Cir.1991). Because the Louisiana Supreme Court has not decided the issue of whether indirect purchasers such as plaintiffs [4] have a cause of action under the Loui-

---

1. La. Civil Code article 2315 reads:

   Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

2. La. Civil Code article 1953 provides:

   Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

3. In an article, "Life on a Federal Island in the Civilian Sea," 15 Mississippi College Law Review 1 (1994), Professor William E. Crawford explains the civilian theory:

   The essence of the theory of jurisprudence constante, ... is that judicial precedent is established by a judge on the basis of general rules of law provided by legislators for the decision of those disputes, and is not based on the general rules of law extracted from judicial precedent. The accumulated precedents gain significance because the words of the legislation, as consistently spoken by judges in their decisions, are attributed to the legislator, and the meaning of the rule of law enacted by the legislator is taken from the specific meaning given to it by judges. Further, the judge analyzes those judicial decisions to determine whether or not they comprise a general rule of law consistent with the needs of the pending case. If what he finds does not fit the needs of the case, then he may disregard the law as spoken by the judges and "return to the words of the general rule of law spoken by the legislator, under the theory that judges are bound to apply the law as given to them by the legislature and not as paraphrased by other judges." *Id.* at 4. (Footnotes omitted).

4. Plaintiffs do not claim that they are the immediate buyers from the defendants, the alleged antitrust violators. Rather, plaintiffs claim that the purported nationwide conspiracy caused retail prices of infant formula purchased by plain-

siana antitrust law, this court must apply the law as the civilian system commands so as to determine what the state supreme court would hold if construction of the law were presented to it.

Interestingly, the substantive state law which federal law requires this court to apply, points the court back to federal case law for guidance. The applicable sections of Louisiana anti-trust law are essentially copies of federal anti-trust law. Because of this similarity, Louisiana courts routinely look to federal anti-trust jurisprudence as "a persuasive influence on interpretation of our own state enactments." See e.g. *La. Power & Light v. United Gas Pipe Line*, 493 So.2d 1149, 1158 (La.1986).

Louisiana law condemns price fixing. La. R.S. 51:122 provides:

> every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the state of Louisiana is illegal.[5]

The bone of contention in this litigation relates to the question of damages and who is allowed to claim them. The operative language is identical in both state and federal statutes. La. R.S. 51:137 provides:

> "any person who is injured in his business or property by any person by reason of any act or thing forbidden by this Part may sue in any court of competent jurisdiction and shall recover three fold the damages sustained by him, the cost of suit, and a reasonable attorney's fee." [6]

Federal interpretation of the damages statute is quite clear: Under § 4 of the Clayton Act, indirect purchasers (consumers) need not apply for damages. The entire antitrust injury is inflicted upon direct purchasers only and the "passing on" of illegal

price increases is not allowed either as a defense in an antitrust action or as damages to plaintiffs who are remote customers.

Plaintiffs here argue that they "persons" who have been injured in their business and property by a conspiracy to fix prices in which the defendants engaged and that under the clear wording of § 137 they are entitled to recover threefold the damages sustained by them. In effect, plaintiffs argue that the courts should apply Article 9 of the Louisiana Civil Code[7] and end the matter. Defendants argue that an in depth consideration of the issues will demonstrate that application of the literal words of the statute leads to absurd consequences and that further interpretation is required.

Initially it cannot be disputed that the purposes of both state and federal law are precisely the same—to discourage price fixing and other forms of restraint of trade and to punish those who engage in such conduct as well as to reward with treble damages the victims of such practices. It is also clear that treble damages are included as a statutory encouragement to private enforcement actions, dubbed "private attorneys general" by the Supreme Court. See e.g. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The federal courts have concluded that antitrust enforcement actions are more likely to be initiated and prosecuted by those who have sustained the most damage rather than by indirect purchasers such as plaintiffs whose individual damage, even trebled, is quite small compared to the damages sustained by direct purchasers.

The court observes that such a proposition is clearly applicable to a case such as this

---

tiffs to be raised, fixed, maintained, and stabilized at artificially high prices. Plaintiffs are, therefore, only indirect purchasers.

**5.** The federal counterpart, Section 1 of the Sherman Act, 15 U.S.C. § 1, reads: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

**6.** Section 4 of the Clayton Act 15 U.S.C. § 15 reads: "any person who shall be injured in his property or business by reason of anything for-

bidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained and the cost of suit, including a reasonable attorney's fee."

**7.** Article 9 of the Code reads: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."

which involves price fixing at the manufacturing level of infant formula distributed over a wide distribution chain and ultimately purchased by plaintiffs at retail outlets. The court also notes that the direct purchasers have already instituted actions against these defendants under federal law and that settlements have been reached with all direct purchasers who do business in the state of Louisiana. Such actions were concluded prior to initiation of this action.

The Supreme Court first directly considered the issue in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). There, the Court had before it an antitrust action brought by a shoe manufacturer against a manufacturer of shoe making equipment. The Court declined to allow the defendant manufacturer to plead that the plaintiff suffered no injury, assuming that defendant did illegally raise prices, because plaintiff was able to pass on the claimed illegal overcharges to those who bought shoes from it. The Court held that under § 4 of the Clayton Act "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." 392 U.S. at 489, 88 S.Ct. at 2229.

The Court also discussed a number of concerns and rejected the notion that "sound laws of economics" require recognition of such a defense:

> We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example) he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total

sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued ... Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories. 392 U.S. at 492, 88 S.Ct. at 2231.

■ The court judicially notices that infant formula, like shoes, is sold to consumers by a wide range of retailers who vigorously compete with each other on a daily basis, and many of them are national chain stores with substantial resources. Many of these retailers engage in extensive advertising campaigns, publicize price comparison with retail competitors, employ "loss leader" sales and other customer enticement activities. In short, a wide range of factors influence their prices on literally thousands of products on a daily basis.

Finally, the Court concluded that allowing such a defense would reduce, not encourage treble-damage actions:

> In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to their customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness. 392 U.S. at 494, 88 S.Ct. at 2232.

The above quoted statement from *Hanover Shoe* seems especially applicable to the case

before this court. Although plaintiffs have never established with any degree of certainty the individual damage sustained by any plaintiff in the purchase of infant formula (admittedly there has been no trial on the merits of the case) it is nevertheless quite clear that each plaintiff (and each member of a potential class) has only a "tiny stake" in this lawsuit.

In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) the Supreme Court reaffirmed the *Hanover Shoe* holding and extended it to prohibit recovery of antitrust damages in almost all cases by indirect purchasers, and commented:

> Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate customers. However, appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness. 431 U.S., at 737, 97 S.Ct., at 2070.

Once again the Court addressed economic theories:

> Under an array of simplifying assumptions, economic theory provides a precise formula for calculating how the overcharge is distributed between the overcharged party (passer) and its customers (passees), If the market for the passer's product is perfectly competitive; if the overcharge is imposed equally on all of the passer's competitors; and if the passer maximizes its profits, then the ratio of the shares of the overcharge borne by passee and passer will equal the ratio of the elasticities of supply and demand in the market for the passer's product. Even if these assumptions are accepted, there remains a serious problem of measuring the relevant elasticities—the percentage change in the quantities of the passer's product demanded and supplied in response to a one percent change in price. . . .

> \* \* \* \* \* \*

More important, as the *Hanover Shoe* Court observed, 392 U.S., at 493, 88 S.Ct., at 2231, 'in the real economic world rather than an economist's hypothetical model,' the latter's drastic simplifications generally must be abandoned. Overcharged direct purchasers often sell in imperfectly competitive markets. They often compete with other sellers that have not been subject to the overcharge; and their pricing policies often cannot be explained solely by the convenient assumption of profit maximization. . . . 431 U.S., at 741–742, 97 S.Ct., at 2072–2073.

This court's earlier comment, regarding competition at the retail level among retailers of products like infant formulas, applies equally here. An economist's hypothetical model which fails to take into account those real world facts would be of little value and would surely confuse the jury.

Finally, the Court concluded:

> We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws, [citation omitted] supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws [citation omitted] is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it. 431 U.S., at 745, 97 S.Ct., at 2074.

In this court's view, the concerns expressed by the Supreme Court apply equally to the Louisiana statute and to this case. A few observations demonstrate why this is so.

First, there is no dispute that antitrust litigation is expensive and complex. Price fixing conspiracies are not ordinarily formulated out in public and they are frequently difficult and expensive to ferret out. To that may be added the cost of expensive expert

witnesses whose testimony is always essential in the proof of damages. The notion that an ultimate consumer having purchased at retail and claiming only a "tiny stake" in the outcome would be encouraged to initiate expensive, complex, and time consuming litigation for small change, simply cannot be accepted.

Moreover, most retail purchasers have no access to information which might even indicate to them that there had been an illegal overcharge in the price of a product at the manufacturers level of the product. This very litigation demonstrates the correctness of such concerns.

It is undisputed, as noted above, that the direct purchasers of infant formula from these defendants have brought antitrust actions under federal law which have already been settled. The same set of lawyers who represented the direct purchasers in the federal action also represent these plaintiffs in this state law class action. While the court is not privy to all of the matters undertaken in the original action, it · is certainly fair to conclude that but for the evidence obtained in the original federal action by the lawyers who now represent these plaintiffs, this action would never have been brought. It is highly unlikely that a consumer of such a product would ever obtain information which could lead him or her to suspect that a price fixing scheme at the top of the distribution chain has increased the retail price of the product by a few cents per unit at the supermarket.

In an antitrust price fixing case, plaintiff must first prove price fixing before reaching the question of damages. The court is confident that in this case the same evidence of conspiracy obtained in the federal antitrust cases against these defendants would be offered. Such evidence is available in this class action only because of the happenstance that counsel for plaintiffs represented the direct purchasers and now represents the class action plaintiffs—and thus has access to the information.

While class actions are valuable for the prosecution of some actions with many claimants, each having small damage, the device is not likely to be useful in antitrust consumer cases involving products such as infant for-

mula. A consumer who discovers a defect in a mass marketed product may be able to establish the defect at little or no cost, and he will ordinarily discover the defect without expert assistance. In those instances, the defect in the other products of the same type as bought by plaintiff may be proved at moderate cost, i.e., if one manufacturer produced and distributed thousands of defective units, it is efficient and economic to prosecute a class action on behalf of representative plaintiffs and all others who bought the product. Individual damage will also be relatively simple and inexpensive to prove.

Not so with price fixing schemes involving products such as infant formula. A consumer buying at retail will know the retail price he pays for the product but in the absence of a situation like the present case would not even have a suspicion, much less actual evidence, that the retail price he paid has been increased by an illegal scheme among the manufacturers. In other words, it seems to this court that in the case of price fixing by manufacturers of mass-marketed products such as infant formula, the ultimate consumer is likely to be the last to know and is the least likely to have the resources to discover and prove such a scheme.

To illustrate the preceding statement, diligent search by this court has failed to produce a single other reported case in Louisiana alleging price fixing among manufacturers of consumer products such as infant formula. What is now La. R.S. 51:122 traces back to Act 86 of 1890, a period of over one hundred years.

It seems to this court that the federal construction of the damages issue is sound— those with the most to gain in a treble-damage action are not only most likely to bring the action but also are more likely to have access to the information regarding illegal price increases and the resources to finance the litigation than those ultimate consumers who may have borne part of the pass-on price increase.

The federal concerns about economic theory also apply to this case. As counsel for the defendants have repeatedly pointed out during the course of this litigation, counsel for plaintiffs propose to use the same economic

expert here as they used in the original federal litigation brought by the direct purchasers. There the expert testified that the direct purchasers sustained all the damage, i.e., no direct purchaser was able to pass-on a single cent of the overcharge. Now that the original litigation has been concluded, the expert has simply turned his economic theoretical model by 180 degrees and is now prepared to testify that direct purchasers passed on **all of the overcharges,** so that the ultimate consumers sustained all of the damage.

At least one learned comment has pointed out that if indirect purchasers are allowed to sue, then the passing on defense must be allowed to the antitrust violators; otherwise multiple treble-damage liability will be tolerated by the law. See **William M. Landes and Richard A. Posner,** *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick,* 46 University of Chicago Law Review 602, at 603.

Under such a scenario, the antitrust victims could well find themselves at each others throats in court, proffering differing economic theories as to who passed on the overcharge to whom. The complexity and cost of such proceedings could be almost beyond comprehension, depending upon the sophistication of the particular distribution chain (or chains) of the product (or products).

This court certainly recognizes that the Louisiana Legislature may adopt a law which grants a cause of action in favor of indirect purchasers of products and the Supreme Court has clearly stated that there is no federal impediment to so doing. *See Calif. v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

The fact, however, that in 1981, following the decision in *Illinois Brick,* the Louisiana legislature declined to amend the Louisiana antitrust statute so as to specifically authorize such actions, is at least a straw in the wind indicating that Louisiana was satisfied with the result of *Illinois Brick.* See (H.B., 772 of 1981, introduced but not adopted by the 1981 Louisiana Legislature.)

This court, for the reasons outlined above, concludes that Louisiana would be on sound ground in following the lead of the Supreme Court in *Hanover Shoe* and *Illinois Brick* and holds that these indirect purchasers have suffered no antitrust damage under Louisiana's antitrust law, La. R.S. 51:137.

### Dismissal Under Louisiana Civil Code Articles 2315 and 1953

■ Plaintiffs have also failed to state a claim under Louisiana Civil Code articles 2315 and 1953. First, a violation of article 2315 requires proof of "fault" on the part of defendants. The only "fault" that plaintiffs assert is defendants' alleged violation of La. R.S. 51:122. Because the court finds that plaintiffs have failed to assert a claim under this statute, plaintiffs should not be able to bypass such a finding by asserting an action under article 2315.

Second, plaintiffs acknowledge that in order to state a cause of action under Louisiana Civil Code article 1953, a contractual relationship must be alleged.[8] As indirect purchasers, plaintiffs cannot assert the existence of any such obligation. Plaintiffs argue, however, that an action for fraud may also be alleged in tort under Article 2315 which would not require plaintiffs to establish such elements as privity, consideration, or breach of contract. Because the court has concluded that plaintiffs have failed to state a cause of action for liability for antitrust activity under Article 2315, the court holds the same for a cause of action for fraud.

### The Other Argument of Defendants

The defendants also advance the argument that the Louisiana statute, La. R.S. 51:122, applies only to intrastate price fixing scheme and that the conspiracy as alleged by plaintiffs is clearly interstate, not intrastate. Hence, defendants argue, the Louisiana statute has no application to their alleged activities.

In view of the conclusion of the court as to the construction of section 137, the court does not express any view on this argument.

Accordingly, for the reasons set forth above, defendants' motion to dismiss for fail-

---

8. Plaintiffs' supplemental memorandum, p. 26.

ure to state a claim is hereby GRANTED and this action will be dismissed.