IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-20898
Summary Calendar
_____


CONSTRUCCIONES INDUSTRIALES DEL GOLFO,
S.A. DE C.V.,

Plaintiff-Appellant,

versus

SEAREX, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston
(H-97-CV-3588)

_____

May 28, 1999

Before JOLLY, SMITH, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

    The dispositive issue in this appeal is whether the parties

entered into a binding contract.  We conclude that they did not,

and we therefore affirm the district court in all respects.

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The facts relevant to our decision are undisputed. During 1997, Searex, Inc. and Construcciones Industriales Del Golfo, S.A. de C.V. ("CIGSA") entered negotiations over a proposed joint venture. The object of this joint venture would have been to construct and charter several new vessels for use in oil and gas exploration. Searex possessed the proprietary design for these new vessels. Eventually, however, the negotiations over a joint venture failed. Soon thereafter, on July 24, 1997, the two parties executed a document entitled "Agreement to Time Charter and Subcharter Vessels." This document's preamble expressed CIGSA's "desire[] to time charter the first two vessels" produced using Searex's proprietary design. The document also expressed Searex's willingness to charter the vessels to CIGSA under certain conditions, and the document contains the following provisions:

[T]he parties hereto agree to the following basic terms:

1. Upon delivery of each of the Vessels by Alabama Shipyard Inc. ("Builder"), it will be chartered by SEAREX to CIGSA under the Master Time Charter Agreement in similar form of Exhibit 1 attached hereto.

2. Each initial vessel time charter will be for a period of not less than two years on a 365-day "Hell or high Water" basis at the charter hire rate of not less than $12,500 per day, plus 25% of the net remaining charter hire, up to $25,000 per day, received from PEMEX[1] or other company

---

[1]Pemex is Petroleos Mexicanos, the Mexican national oil company. As is evident from the document, the parties initially thought that Pemex would be the third party to whom CIGSA would subcharter the vessels.

or under the PEMEX Subcharter or other company subcharter of the vessels.

3.  CIGSA will subcharter each of the vessels to PEMEX or other company acceptable to MARAD,[2] under a subtime charter in similar form to Exhibit B attached hereto.

4.  This agreement will become effective upon MARAD approval and shall terminate if such approval is not obtained by October 31, 1997.

These provisions mention several non-existent documents. Although provision (3) contemplates a subtime charter form, no such form was ever attached to the document. Furthermore, a subtime charter agreement involving CIGSA has never been entered. The Master Time Charter form, mentioned in provision (1), was attached to the document. This form, essentially a red-lined, working draft, stated (in Article 3 of the form) that "Each ~~vessel~~ Vessel shall be delivered to CHARTERER at the time and place ~~and for the duration and subject to the extensions~~ specified in the applicable Short Form." The parties, however, never created a Short Form.

After executing the document, the parties continued to negotiate over the terms of a Master Time Charter Agreement. In the midst of these negotiations, on August 8, 1997, Searex sent CIGSA proposed changes to the Agreement form. The relevant changes were indicated in a new, draft version of the proposed Agreement:

### Article 2 - Charter

Subject to the conditions set forth herein OWNER agrees to charter the Vessels to CHARTERER, and CHARTERER

---

[2]MARAD is the federal government's Maritime Administration. Searex sought financing for the vessels from MARAD.

3

agrees to hire the ~~Vessel~~ <u>Vessels</u> from OWNER on the terms and conditions set forth herein.  Each Vessel shall be subjected to this Agreement by the execution by the parties of a Short Form.  Each Vessel shall be subjected to this Agreement upon delivery of the Vessel to the Owner by its builder, Alabama Shipyard, Inc. (the "Builder").  OWNER shall give CHARTERER at least 30 days notice of the delivery date proposed by the Builder, but OWNER shall have no liability to CHARTERER or any one claiming by, through or under CHARTERER for failure to deliver the Vessel as per any notice given by OWNER <u>or for any delay in delivery of either Vessel for any reason whatsoever.  CHARTERER's sole and exclusive remedy for any delay in delivery shall be to cancel this Agreement in accordance with the provisions of the last sentence of Article 1 hereof</u>.[3]

OWNER shall have no obligation to charter any Vessel to CHARTERER hereunder unless, (i) at least 90 days before the projected delivery date of a Vessel (of which delivery date OWNER shall have notified CHARTERER), CHARTERER has secured a subcharter of the Vessel to ~~PEP; and~~ <u>a Permitted Subcharterer;</u> (ii) prior to the commencement of the term of the charter of such Vessel, OWNER shall have received the consent of MarAd to charter the Vessel to CHARTERER and to subcharter it to ~~PEP.~~ <u>such Permitted Subcharterer; and (iii) MarAd shall have approved proceeding with the construction and financing of the second Vessel pursuant to the terms of the Commitment to Guarantee referred to in the second recital of this Agreement.</u>

In response to Searex's proposed changes, CIGSA sent a reply memorandum on August 11, 1997, with the following language:

We have received your last form of the charter agreement between Searex and CIGSA and are in agreement with its terms.  However there is a point that has to be clarified . . . .  Regarding delivery date of the Vessel, according to the information we had originally received from Searex, we have negotiated with Pemex to prepare a tender

---

[3]The referenced sentence states, "Each party may cancel ~~the~~ <u>this</u> Agreement upon the giving of thirty (30) days prior written notice to the other, provided, however, that any unexpired Short Form shall continue in effect subject to the terms and conditions hereof until expiration of such Short Form."

for the contract of the Vessels with a delivery of no later than April 30 of next year. Said delivery must be guaranteed with a performance bond equal to 10% of the total value of the contract.

As you can understand we must comply with said date, and therefore can not accept your proposal that owner shall have no responsibility whatsoever in regard to late delivery. . . . In short, we must insert language that explains that both Searex and CIGSA, will make its best efforts to guarantee delivery in Mexico by no later than April 30, and in case of fault to that deadline, if such is pertaining to any other party, they in turn shall face the responsibilities that may arise.

What must be clearly understood is that the tender will be published in the next 10 days, and we are not in a position to negotiate deliveries later than April 30.

The remaining conditions of the charter . . . are acceptable.

No other relevant communication occurred between Searex and CIGSA until October 1, 1997, when Searex sent CIGSA a letter stating that the parties had not reached an agreement sufficient to pursue "the SEAREX/CIGSA project," and that Searex would explore other opportunities for the use of its vessels. One last, important fact to note is that MARAD never gave its approval (see provision (4)).

II

After receiving Searex's letter, CIGSA filed suit against Searex for breach of contract.[4] CIGSA sought damages and specific performance as relief for the alleged breach. The district court issued a very able, comprehensive opinion addressing Searex's

---

[4]CIGSA also included other claims, none of which CIGSA presents on appeal.

motion for summary judgment and CIGSA's partial motion for summary judgment and its motion for leave to amend its complaint.  The district court concluded that Searex and CIGSA never entered a binding contract.  Accordingly, the district court found that Searex could not be held liable under any of CIGSA's breach of contract theories.  The  district court then reviewed CIGSA's proposed waiver and estoppel arguments (which CIGSA sought to add to an amended complaint), and concluded that those arguments had no merit.  The district court therefore decided to deny CIGSA's motion to amend its complaint as futile.  In its final judgment, the district court granted Searex's motion for summary judgment, denied CIGSA's motion for partial summary judgment, denied the motion to amend the complaint, and dismissed the complaint.

III

We review the grant of summary judgment de novo, using the same standard as the district court.  Burditt v. West American Ins. Co., 86 F.3d 475, 476 (5th Cir. 1996).  We will affirm the grant of summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Upon our thorough review of the record, and with the standards for granting summary judgment well in mind, we conclude that the district court was exactly correct in granting Searex's motion for summary judgment after finding that the parties did not enter a binding contract.

6

We begin by noting that the parties never agreed on a Master Time Charter Agreement. Contrary to CIGSA's arguments on appeal, CIGSA did not accept the Master Time Charter Agreement proposed by Searex on August 8. CIGSA's August 11 letter effectively rejected the proposed agreement by rejecting various terms and demanding that any Agreement contain newly suggested language. See, e.g., Restatement (Second) of Contracts § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."); Blackstone v. Thalman, 949 S.W.2d 470, 473 & n.4 (Tex. Civ. App. 1997, no writ). For example, CIGSA's August 11 letter stated that CIGSA "[could] not accept [Searex's] proposal that owner shall have no responsibility whatsoever in regard to late delivery." The CIGSA letter then went on to say that "we must insert language that explains that both Searex and CIGSA will make its best efforts to guarantee delivery in Mexico no later than April 30, and in case of fault to that deadline . . . they in turn shall face the responsibilities that may arise." Thus, although CIGSA did begin its letter by informing Searex that CIGSA was in agreement with the proposed Agreement's terms, CIGSA clearly did not accept all of those terms and demanded the inclusion of others.

Given that the parties never agreed to a Master Time Charter Agreement, we are left to consider whether the July 24 document

binds Searex to enter a charter agreement with CIGSA. CIGSA argues that the document does exactly this because it contains all of the necessary terms, including price (see provision (2) of the July 24 document) and delivery date. The document specifies the date, CIGSA argues, in provision (1): "Upon delivery of each of the Vessels by Alabama Shipyard Inc. ("Builder"), it will be chartered by SEAREX to CIGSA . . ." Although the document does not specify a date that one can locate on a calendar, CIGSA argues that this provision indicates that the parties agreed to the condition--i.e., delivery by Alabama Shipyard, Inc.--that would fix that date at some time in the future.

This argument has no merit. The undisputed evidence shows that the parties did not, in fact, intend for the statement in provision (1) to bind the parties to any preordained delivery date. First, the attached Master Time Charter Agreement form stated that the exact delivery date would be specified in a "Short Form" (which, again, was never created). Second, CIGSA's own statements, in its August 11 letter, reveal that it did not intend for the July 24 document to fix a binding delivery date. In its letter, CIGSA stated that it was "not in the position to negotiate deliveries later than April 30." Obviously, CIGSA thought that the delivery date was open to negotiation.

But we need not rest our decision on the fact that the July 24 document was defective for failing to contain essential elements of an agreement. The July 24 document, by its own terms, would not

8

become effective until MARAD approved the agreement (see provision (4)). MARAD never granted its approval and the document, therefore, never had any legal effect. CIGSA argues that Searex should not be able to defend itself by pointing to this provision because Searex ended its attempts to come to an agreement (as stated in Searex's October 1st letter) before the October 31 deadline. Therefore, CIGSA argues, it was still possible for Searex to obtain MARAD approval, but Searex prematurely gave up; in legal terms, CIGSA argues that Searex anticipatorily repudiated the contract. Searex counters this argument by pointing out that CIGSA did not cooperate with Searex (by supplying necessary documents) in gaining MARAD approval. But all of this is beside the point: the July 24 document had absolutely no effect--and could not, therefore, bind Searex in any way--until MARAD approved the document. In other words, and as the district court's incisive opinion notes, Searex could not anticipatorily repudiate a contract when there was no contract. See <u>Texas Dept. of Housing and Community Affairs v. Verex Assurance, Inc.</u>, 68 F.3d 922, 928 (5th Cir. 1995) ("'When a promise is subject to a condition precedent, there is no liability or obligation on the promisor and there can be no breach of contract by him until and unless such condition or contingency is performed or occurs.' <u>Reinert v. Lawson</u>, 113 S.W.2d 293, 294 (Tex. Civ. App.--Waco, 1938, no writ)."); <u>Valencia v. Garza</u>, 765 S.W.2d 893, 898 (Tex. Civ. App. 1989, no writ) ("[A]

valid contract must first be established in order to prove repudiation.").

In sum, the July 24 document never became effective. As no contract existed, CIGSA's breach of contract claim must fail.

B

Finally, we consider whether the district court abused its discretion in denying CIGSA the opportunity to amend its complaint by adding arguments based on waiver and estoppel. See Ashe v. Corley, 992 F.2d 540, 542 (5th Cir. 1993) (stating that district court's denial of leave to amend a complaint is reviewed for abuse of discretion).

Aside from the fact that the deposition testimony CIGSA points to, see CIGSA Br. at 42-44, does not, in any way, support its stated characterizations of the alleged nefarious behavior by Searex, we are able nevertheless easily to conclude that the district court was correct in finding that amendment would be futile. To support its arguments, CIGSA cites the same two cases that it cited in the district court and does not attempt to explain why the district court's plain reading of Fifth Circuit precedent is somehow erroneous. CIGSA cites Wheeler v. White, 398 S.W.2d 93 (Tex. 1965), for the proposition that "a party can be estopped by its conduct from claiming that a contract is not sufficiently specific to be enforced." CIGSA Br. at 45. CIGSA thus argues that Searex's conduct estops it from denying the existence of a contract based on alleged indefiniteness.

10

As we have explained above, however, the July 24 document is not a contract that has failed for indefiniteness. Instead, it is a document that never went into effect--not because of legal indefiniteness, but because of its own terms (in provision (4)). As the district court explained, we have recognized that "[i]t is a well-established principle in Texas that 'contract rights cannot be created by estoppel [but estoppel can] prevent a parties conduct and actions from operating as a denial of the right of enforcement of a contractual obligation already created.'" Oliver Resources PLC v. International Finance Corp., 62 F.3d 128, 131 (5th Cir. 1995) (bracketed phrase in original) (quoting Roberts v. California-Western States Life Ins. Co., 470 S.W.2d 719, 726 (Tex. Civ. App. 1971)). Furthermore, and, again, as the district court noted, we have said that Wheeler does not contravene the basic principle that estoppel does not affirmatively create contract rights. Oliver Resources, 62 F.3d at 131 n.5. Wheeler does not contravene this basic principle because "Wheeler involved a contract between the parties that was later found defective." Id. See also Wheeler, 398 S.W.2d at 96 ("[Promissory estoppel] does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them. The function of the doctrine of promissory estoppel is, under our view, defensive in that it estops a promisor from denying the enforceability of the promise."). As CIGSA has cited no other authority to support its

11

arguments, we are certain that the district court has not abused its discretion.

III

For the foregoing reasons, we AFFIRM the district court's judgment in all respects.

A F F I R M E D.