REVISED, June 17, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10167
_____


THE FIRST NATIONAL BANK OF DURANT,

                              Plaintiff-Appellant,

                    versus

TRANS TERRA CORPORATION INTERNATIONAL, ET AL.,

                              Defendants,

LANE & DOUGLASS and DON R. LANE,

                              Defendants-Appellees.


                _____

                No. 97-10914
                _____


THE FIRST NATIONAL BANK OF DURANT,

                              Plaintiff-Appellant,

                    versus

MALCOLM C. DOUGLASS,

                              Defendant-Appellee.

_____

        Appeals from the United States District Court for
              the Northern District of Texas
_____
                      May 27, 1998

Before REAVLEY, JONES and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

The principal issue in this diversity case is whether a lender can pursue a negligence claim against an attorney who, in the course of representing a borrower, submits an inaccurate title opinion to the lender. Because we hold that Texas law allows for such a claim under the facts presented, we reverse.

BACKGROUND

Tim Epps was the president and owner of Trans Terra Corporation International (Trans Terra). Trans Terra owned interests in six oil and gas wells known as the Ledrick wells, located in Roberts County, Texas. Attorney Malcolm Douglass, of the firm of Lane & Douglass, prepared a lease on the Ledrick wells for Epps in 1990. In the course of preparing the lease and a 1992 opinion letter, he personally went to the Roberts County courthouse to examine title records on the wells. Thereafter he prepared numerous title opinions on the wells purporting to show the ownership interests of Trans Terra. In preparation of these later opinions he did not examine courthouse records for the documents affecting the title, but instead relied on information provided to him by Epps and a landman, Chuck Robinson.

In October of 1993 Epps approached appellant First National Bank in Durant (the Bank), seeking a $2 million loan to Trans Terra, to be secured by Trans Terra's interest in the Ledrick wells. In considering the loan request, the Bank reviewed 1993 title opinions Douglass had prepared for Trans Terra. These title opinions were addressed to Epps and Trans Terra.

2

In November of 1993 the Bank agreed to loan Trans Terra $1.5 million, provided that the Bank receive an updated title opinion addressed to the Bank. Attorney Ben Munson documented the loan transaction for the Bank by preparing all of the loan documents except the title report. He prepared a promissory note and a deed of trust providing a description of the collateral derived in part from Douglass' title opinions. The property descriptions state that Trans Terra had a .33 net revenue interest in three of the Ledrick wells and a .48761 net revenue interest in the other three Ledrick wells.

The loan was set for closing on November 19. On November 18 Munson faxed Douglass a letter requesting a title opinion on the Ledrick wells that was (1) "dated within 30 days of November 19, 1993," and (2) addressed to the Bank. Douglass had no prior notice that he was to prepare such a title opinion. Epps flew to Oklahoma for the November 19 closing. Bank officers and Munson attended the closing on behalf of the Bank. Epps did not bring the title opinion the Bank expected. Epps called Douglass and requested the opinion. This conversation was made on a speaker phone in the presence of Munson and the Bank personnel. Epps told Douglass that he had promised the Bank a title opinion and asked Douglass to prepare it. Munson recalled that Epps told Douglass he was in the process of closing a loan and needed a title opinion directed to the Bank as soon as it could be completed. Douglass stated that he did not have time to prepare the opinion that day. Epps and the Bank agreed to sign the loan

3

documents with the understanding that the loan would not fund until the title report was received.

On the following Monday, November 22, Douglass forwarded a title opinion to the Bank. As requested, this title opinion was addressed to the Bank. It states that the "title opinion is rendered solely and exclusively for your benefit." It also states that Douglass has "examined the Deed Records of Roberts County, Texas, from inception of title to the date of this opinion as to the captioned acreage." In fact, Douglass had not examined records at the courthouse to the date of the opinion, and had not received any new information from the landman, Robinson.

Trans Terra defaulted on the loan. The Bank proceeded to foreclose on the collateral, namely Trans Terra's interests in the Ledrick wells. The November 22 title opinion and earlier title opinions prepared by Douglass were incorrect. For example, Douglass later wrote the Bank in December of 1994, informing it that Trans Terra's net revenue interest on the Ledrick 55-1 well was .039375, versus .33 as represented in the November 22 title opinion, and the net revenue interest in the Ledrick 55-4 well was .028150, versus .33 as represented. In preparing the title opinion Douglass failed to discover certain instruments which caused Trans Terra's interests in the Ledrick wells to be substantially smaller that those represented in the title opinion. The Bank's expert testified that Douglass was negligent

4

in preparing the title opinion without having examined the courthouse records.

The Bank sued Trans Terra, Epps, Douglass, Lane & Douglass, and Douglass' law partner Don Lane. Trans Terra and Douglass filed for bankruptcy. Proceedings against Trans Terra and Douglass were severed and administratively closed. The Bank and Epps later entered into an agreed but uncollectible judgment. The case proceeded to trial against the law firm and Lane, based on theories of legal malpractice and negligent misrepresentation on the part of Douglass. The jury sided with the Bank, finding an attorney-client relationship between Douglass and the Bank, and negligence on the part of Douglass. It awarded damages in the amount of the deficiency on the loan.

The district court granted a post-verdict motion for judgment as a matter of law in favor of defendants Lane and the law firm. It concluded that under Texas law the Bank was not Douglass' client, and therefore could not recover against these defendants. Douglass then dismissed his bankruptcy case, notified the district court that the automatic stay had been terminated, and moved for summary judgment based on the court's judgment in favor of Lane and the law firm. The court granted summary judgment in favor of Douglass, consistent with its prior ruling that the absence of attorney-client privity between the Bank and Douglass precluded a recovery for the Bank.

The Bank appeals the judgment in favor of Lane and the law firm, and the separate judgment entered in favor of Douglass.

5

Appellees concede that if the judgment as a matter of law in favor of Lane and the law firm must be reversed, the summary judgment in favor of Douglass cannot stand.

## DISCUSSION

A judgment as a matter of law is warranted if the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable people could not arrive at a verdict to the contrary.[1] In this diversity case, we must of course endeavor to decide the case as the Texas Supreme Court would decide it.[2]

A. *Attorney-Client Privity and Negligent Misrepresentation*

The district court concluded that a reasonable jury could not find an attorney-client relationship between Douglass and the Bank. The Bank argues that there was sufficient evidence to support such a finding, and alternatively, that the Bank can recover under a negligent misrepresentation theory irrespective of an attorney-client relationship. We find merit with the latter argument.

Texas law is clear that a legal malpractice claim requires proof of an attorney-client relationship between the plaintiff and the defendant attorney. In *Banc One Capital Partners Corporation v. Kneipper*, we explained:

---

[1] *Texas Farm Bureau v. United States*, 53 F.3d 120, 123 (5th Cir. 1995).

[2] *Texas Dep't of Housing and Community Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th Cir. 1995); *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397-98 (5th Cir. 1986) (en banc).

> In order to establish liability for professional negligence or legal malpractice, the [plaintiffs] must show the existence of a duty owed to them by [the attorney], a breach of that duty, and damages arising from the breach.  Under Texas law, there is no attorney-client relationship absent a showing of privity of contract, and an attorney owes no professional duty to a third party or non-client.[3]

This principle was confirmed in *Barcelo v. Elliott*,[4] where the Texas Supreme Court held that an attorney who negligently drafts a will or trust agreement owes no duty of care to the beneficiaries of the will or trust.  The court noted that the "potential tort liability to third parties would create a conflict during the estate planning process, dividing the attorney's loyalty between his or her client and the third-party beneficiaries."[5]  It reasoned that "the greater good is served by preserving a bright-line privity rule which denies a cause of action to all beneficiaries whom the attorney did not represent. This will ensure that attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation."[6]  It also expressed concern that "[w]ithout this 'privity barrier,' the rationale goes, clients would lose control over the attorney-client

---

[3]  67 F.3d 1187, 1198 (5th Cir. 1995) (citations omitted).

[4]  923 S.W.2d 575 (Tex. 1996).

[5]  *Id*. at 578.

[6]  *Id*. at 578-79.

relationship, and attorneys would be subject to almost unlimited liability."[7]

In support of the existence of an attorney-client relationship between Douglass and the Bank, the Bank points out that the November 22 title opinion was addressed to the Bank, and states that it "is rendered solely and exclusively for [the Bank's] benefit." Appellees Douglass, Lane, and Lane & Douglass (hereinafter the lawyers) point to evidence rebutting the existence of an attorney-client relationship. The Bank had its own counsel, Munson. Munson's letter to Douglass requesting the preparation of the title opinion states that "[i]t is my understanding that you represent Trans Terra Corporation International," the borrower. Douglass never billed the Bank for his services, and consistent with lending practices, the borrower paid all the closing costs, including the legal fees of Douglass and Munson. Douglass testified that his clients were Trans Terra and Epps. Further, the title opinion states in its opening sentence that it was prepared at the request of Epps.

We agree with the district court that the lawyers were entitled to judgment as a matter of law on the legal malpractice claim, because no attorney-client relationship existed between Douglass and the Bank. The mere fact that the November 22 letter was addressed to the Bank, or states it was prepared for the benefit of the Bank, is insufficient to establish an attorney-client relationship. In *Bank One*, the opinion letter in issue

---

[7]  *Id*. at 577.

8

was addressed to the plaintiff investors, and stated that it was furnished solely for their benefit, yet we held as a matter of law that no attorney-client relationship existed between the investors and the defendant law firm retained by the issuer of the securities purchased by the plaintiffs.[8]  Further, the statement in the opinion letter that it was rendered solely and exclusively for the Bank's benefit must be read in context.  The next sentence states that "[i]t is not a representation of the title to the subject acreage to any other party."  The disclaimer was plainly intended to protect Douglass from claims of reliance by parties other than the Bank, rather than to manifest an intention to create an attorney-client relationship.

An attorney-client relationship can arise by express agreement or by implication from the parties' actions.[9]  However, courts will not readily find an implied relationship "absent a sufficient showing of intent."[10]  In *Banc One*, we held as a matter of law that neither an expressed nor implied attorney-client relationship existed based on a single letter addressed to plaintiffs and purporting to give an opinion solely for their benefit.

Likewise, a rational jury could not find an implied attorney-client relationship in this case based on the November 22 title opinion, where (1) Douglass did not bill the Bank for

---

[8]  *Banc One*, 67 F.3d at 1199 & n.21.

[9]  *Id*. at 1198.

[10]  *Id*.

9

his services, (2) the Bank had its own counsel, (3) the Bank's counsel stated in his November 18 letter his understanding that Douglass represented Trans Terra, not the Bank, (4) Douglass testified without qualification that his clients were Epps and Trans Terra, not the Bank, and (5) the title opinion states that it was prepared at the request of Epps.[11] The attorney-client relationship is contractual in nature.[12] Whether the contract is express or implied, there must be a meeting of the minds that the attorney will render professional services to the client.[13] An "implied" contract merely refers to the manner of proof; the meeting of the minds is inferred from the conduct of the parties or the circumstances.[14] On these facts, a rational jury could not infer a meeting of the minds that Douglass would serve as attorney for the Bank.

The Bank argues that the testimony of its attorney expert supports a finding of an express or implied attorney-client

---

[11] *Cf. Kotzur v. Kelly*, 791 S.W.2d 254, 258 (Tex. App.--Corpus Christi 1990, no writ) (holding that fact issue precluded summary judgment on issue of implied attorney-client relationship where attorney admitted that he knew that plaintiffs did not have a separate attorney, and charged plaintiffs for his services.)

[12] *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex. App.--Houston [14th Dist.] 1997, writ dism'd by agr.).

[13] *Id.; Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex. App.--El Paso 1994, writ denied) (holding that elements of a contract, including element of meeting of minds, are the same whether the contract is express or implied).

[14] *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972); *Williford v. Submergible Cable Servs., Inc.*, 895 S.W.2d 379, 384 (Tex. App.--Amarillo 1994, no writ).

relationship between Douglass and the Bank. He testified that when a lawyer addresses a title opinion to a lender, the lawyer is "in effect" representing the Bank. We agree with the lawyers that the unqualified statement by the expert that the lawyer always represents the addressee of a title opinion is a legal conclusion that will not support the verdict, and is further an incorrect statement of the law. The designation of an addressee in a title opinion letter, without more, does not establish a meeting of the minds that the author of the title opinion will serve as counsel to the addressee.

Even though an attorney-client relationship did not exist between Douglass and the Bank, we agree with the Bank that under the facts presented Texas law allows it a cause of action under a theory of negligent misrepresentation. At the outset we note that the Bank's complaint asserted separate causes of action for attorney malpractice and negligent misrepresentation. Likewise, the jury charge instructed the jury on both legal malpractice and negligent misrepresentation (the former requiring proof of an attorney-client relationship), and the jury found liability and damages under both theories.

The Texas Supreme Court, in *Federal Land Bank Association of Tyler v. Sloane*,[15] adopted the common law cause of action for negligent misrepresentation as set out in the RESTATEMENT (SECOND) OF TORTS § 552 (1977). Under § 552:

---

[15] 825 S.W.2d 439, 442 (Tex. 1991).

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

   (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

   (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Sloane* expressly agreed with the Restatement's definition, and also set out its own elements of the negligent misrepresentation cause of action:

(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.[16]

Under either formulation of the elements of a negligent misrepresentation claim, the evidence supports a finding of liability against Douglass.

The lawyers argue that a negligent misrepresentation cause of action cannot be asserted against an attorney absent an attorney-client relationship between the plaintiff and the attorney. In *F.E. Appling Interests v. McCamish, Martin, Brown &*

---

[16] *Sloane*, 825 S.W.2d at 442.

*Loeffler*,[17] the Texarkana Court of Appeals recently held that attorneys are subject to liability under the § 552 cause of action for negligent misrepresentation, whether or not an attorney-client relationship existed.  In *Appling*, decided after the district court granted the motion for judgment, the plaintiff sued a savings association, VSA, under a lender liability theory. The parties worked toward a settlement, but the plaintiff was concerned that the settlement agreement would not be enforceable if VSA became insolvent and was taken over by the FSLIC.  To complete the settlement, an attorney for the defendant law firm signed a settlement agreement, stating that VSA and its counsel represent that the agreement has been approved by the VSA board of directors and otherwise meets the requirements of 12 U.S.C. § 1823(e).  Later, VSA did become insolvent, the FSLIC became the receiver, and a federal court held that the settlement agreement was unenforceable because it did not comply with § 1823(e). After analyzing *Barcelo* and other authorities, the court held that contractual privity between the plaintiff and the defendant attorney is not required if the elements of a § 552 negligent misrepresentation claim are otherwise met.[18]

The *Appling* court reasoned that a negligent misrepresentation claim is not premised on the breach of a duty a professional owes his client or others in privity, but on an independent duty based on the attorney's manifest awareness of

_____

[17] 953 S.W.2d 405 (Tex. App.--Texarkana 1997, writ denied).

[18] *Id*. at 406-08.

13

plaintiff's reliance on the representation and intention that the plaintiff so rely.[19]  It noted that its holding did not conflict with *Barcelo*, since the plaintiffs in that case "would have no negligent misrepresentation cause of action because the defendant never made a representation to them."[20]

"[A] decision by an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"[21]  Although the lawyers correctly point out that *Appling* is in conflict with earlier intermediate state appellate court decisions,[22] we are persuaded that the Texas Supreme Court would agree with *Appling*.  It is the latest authority from the Texas courts, and in our view is directly on point.  The Texas Supreme Court denied review in *Appling.*  The *Appling* court had the benefit of the Texas Supreme Court's decisions in *Sloane* and *Barcelo*, the most recent Texas Supreme Court decisions relevant to the issue presented, and discussed both cases.  We further

---

[19] *Id*. at 408.

[20] *Id*. at 409.

[21] *Verex Assurance*, 68 F.3d at 928 (citation omitted).

[22] *Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 623 (Tex. App.--Houston [1st Dist.] 1993, writ denied); *First Mun. Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart*, 648 S.W.2d 410, 413-14 (Tex. App.--Dallas 1983, writ ref'd n.r.e.); *Bell v. Manning*, 613 S.W.2d 335, 337-38 (Tex. Civ. App.--Tyler 1981, writ ref'd n.r.e.).

14

note that writing contrary to *Appling* in earlier Texas cases was not essential to the holdings in those cases.[23]

We also conclude that the Texas Supreme Court's reasons for requiring attorney-client privity in legal malpractice cases do not compel a privity requirement in a negligent misrepresentation case such as this one.  As discussed above, *Barcelo* reasoned that the privity requirement is justified because: (1) "potential tort liability to third parties would create a conflict during the estate planning process, dividing the attorney's loyalty between his or her client and the third-party beneficiaries;"[24] (2) the privity requirement "will ensure that attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation;"[25] and (3) "[w]ithout this 'privity barrier' . . . clients would lose

---

[23] While *Thompson* rejects the application of § 522 to lawyers, it is readily distinguishable from *Appling* and the pending case because the evidence was undisputed that the law firm defendant made no representations to the plaintiffs.  859 S.W.2d at 622.  *First Municipal Leasing* imposed a privity requirement in a negligent misrepresentation case, but also held that even absent a privity requirement "the final result in the present case would be the same . . . . [T]he non-client First Municipal could not recover for the alleged negligence because it did not rely upon the opinion of the Attorneys."  648 S.W.2d at 413.  Similarly, *Bell* requires privity between the attorney and the plaintiff, but indicates that the result would have been the same without a privity requirement because "we fail to see how the [representation] could be classified as a negligent representation . . . ."  613 S.W.2d at 339.

[24] *Barcelo*, 923 S.W.2d at 578.

[25] *Id*. at 578-79.

15

control over the attorney-client relationship, and attorneys would be subject to almost unlimited liability."[26]

These concerns are not present where the negligent misrepresentation claim is premised on the facts presented in the pending case. There is no conflict of interest where, as here, both the client borrower and the third party lender jointly ask the attorney to prepare an opinion letter. A conflict could only arise if the client secretly hopes that the title opinion will contain false information, and we see no reason to protect the attorney from his own negligence with a privity barrier in such circumstances. We see no burden on zealous representation when both the lender and client request a discrete service from the attorney, namely the preparation of a title opinion. Again, barring sinister motives of the client, both client and lender seek only a accurate title opinion. Further, where as here the client directs the attorney to prepare a title opinion for a single lender, and the attorney prepares the opinion disclaiming liability to any party other than the lender, there is little risk that the client will lose control over the attorney-client relationship or the attorney will face unlimited liability.

B.   *Other Issues*

The lawyers argue that the evidence does not show that the inaccurate title opinion was the proximate cause of any injury to the Bank, since the loan documents were signed before the title opinion was received. The evidence shows, however, that Epps and

---

[26]   *Id*. at 577.

16

the Bank agreed that the loan would not fund, and indeed it did not fund, until the title opinion was received. The lawyers argue that the Bank was legally obligated to fund the loan after the loan documents were signed, whether or not the title opinion was received. A rational jury could conclude that, regardless of the terms of the loan documents, Epps understood that no loan proceeds would be forthcoming without the title opinion, and that he would not have demanded the proceeds without the title opinion. Further, the loan agreement states that the borrower agrees to furnish certain defined financial information and "such other information from time to time as Bank may reasonably request," and the deed of trust requires Epps to furnish, at any time upon request of the Bank, real estate documents, including "instruments of further assurance . . . and other documents as may in the sole opinion of the [Bank] be necessary or desirable to effectuate, complete, perfect, continue or preserve" Trans Terra's loan obligations.

The lawyers argue that the jury was incorrectly instructed that the measure of damages is "the amount of money paid out by the Bank, minus recoveries had on the loan." They argue that the correct measure of damages is the difference between the true value of the collateral and the value of the collateral as represented in the title opinion. We agree with the district court's instruction. In *Sloan*, the court adopted the measure of damages as set out in RESTATEMENT (SECOND) OF TORTS § 552B (1977).

Under § 552B:

17

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause, including

   (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; *and*

   (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.[27]

The evidence supports a measure of damages equal to the entire amount of the loan, minus the amounts secured through note payments and foreclosure, since such a measure reflects the "pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation." The Bank's president testified that if the November 22 title opinion had shown Trans Terra's true interests in the Ledrick wells, the Bank would not have made the loan at all, for two reasons. First, the Bank would not have made the loan if the interests set out in the title opinion had been seriously at odds with earlier representations of Trans Terra's interests. Second, the cash flow expected from the true interests would not have been sufficient to support the loan.[28]

---

[27] *Sloane*, 825 S.W.2d at 442 (emphasis added).

[28] While the jury instruction was correct, we note that testimony regarding the amount of the Bank's damages does not appear to square with the correct measure of damages. The Bank's president testified that the Bank recovered $501,766 at foreclosure, on a loan of $1.5 million. Yet he testified that the amount still owing on the note was $1,214,260. This figure apparently includes interest the Bank would have received under the terms of the note. However, § 552B, as quoted above, does not allow the plaintiff to recover the benefit of the plaintiff's

18

The lawyers moved for a new trial in the alternative to their motion for judgment. The district court denied this motion, which was mooted by the granting of the motion for judgment. The lawyers contend that if we reverse the judgments, we should hold that they are entitled to a new trial rather that entry of judgment against them on the jury verdict.

The ground for the new trial motion was that the district court allowed the Bank's expert to testify about the November 22, 1993 title opinion. The lawyers complain that the expert report produced before trial did not reference that title opinion as a document the expert had reviewed, as required by FED. R. CIV. P. 26(a).

"The admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and that decision will not be disturbed on appeal unless it is manifestly erroneous."[29] Further, the admission of expert testimony in violation of Rule 26(a) is subject to harmless error analysis.[30]

The district court did not manifestly err in allowing the expert to testify about the November 22 title opinion. The

---

contract. *Sloane* explains that § 552B "allows for damages suffered in reliance upon negligent misrepresentation, but not for the failure to obtain the benefit of the bargain." 825 S.W.2d at 443. Accordingly, the Bank is only entitled to recover the amount of principal it originally loaned, minus the amounts secured through pre-default loan payments and foreclosure, plus any prejudgment and post-judgment interest Texas law might allow.

[29] *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 180 (5th Cir. 1995).

[30] FED. R. CIV. P. 37(c)(1).

expert report indicates that the expert had reviewed numerous other title opinions Douglass had prepared, which provided essentially the same opinions contained in the November 22 title opinion. The expert report goes on to give the opinion that Douglass was negligent "in the preparation of the oil and gas title opinions" insofar as the opinions represent that he had reviewed the courthouse records when in fact he had not. The report assumed that Douglass had not reviewed the courthouse records. The lawyers knew or should have known that the expert would have the same opinion as to the November 22 title opinion, whether or not he had reviewed it prior to preparing the expert report, and that the Bank would ask him about that title opinion at trial.

The judgments below are reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.


<span style="color:red">ENDRECORD</span>

EDITH H. JONES, Circuit Judge, dissenting.


With due respect to my colleagues' sensitivity to Texas law, and with some sympathy for the result they reach, I feel I must respectfully dissent from the portion of the majority opinion discussing negligent misrepresentation under RESTATEMENT (RECORD) OF TORTS § 552.

Texas case law is without doubt unclear regarding whether lawyers are liable for the tort of negligent misrepresentation absent a privity relationship. Two lines of cases now directly conflict with each other in their statement of the law. *Compare F.E. Appling Interests v. McCamish, Martin, Brown & Loeffler*, 953 S.W.2d 405 (Tex. App.—Texarkana 1997, pet. denied) (permitting a negligent misrepresentation claim against an attorney absent privity) *with Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 622-23 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *First Mun. Leasing Corp. v. Blakenship, Potts, Aikman, Hagin & Stewart*, 648 S.W.2d 410, 413-14 (Tex. App.—Dallas 1983, writ ref'd n.r.e.); *Bell v. Manning*, 613 S.W.2d 335, 338 (Tex. Civ. App.—Tyler 1981, writ ref'd n.r.e.) (all holding that a negligent misrepresentation claim pursuant to § 552 cannot be made absent an attorney-client relationship). Although, as the majority here notes, the "anti-negligent misrepresentation" cases may be factually distinguishable such that their holdings could (not must) rest on other grounds, their statement of the law could not be more clear and forthright—and contradictory to

21

*Appling*.  The Supreme Court's unfortunate denial of review in *Appling* affords no solution to the dilemma.

But in a closely related case, the Texas Supreme Court has strictly construed the privity requirement for a legal malpractice claim wherein third-party beneficiaries of a trust sue the lawyer and law firm that created the trust.  *See Barcelo v. Elliott*, 923 S.W.2d 575 (Tex. 1996).  In doing so, the court rejected the position of the vast majority of states, which have relaxed the privity barrier in the estate planning context.  *See id*. at 577-78; *see also id.* at 579 (Cornyn, J., dissenting) ("By refusing to recognize a lawyer's duty to beneficiaries of a will, the Court embraces a rule recognized by only four states, while simultaneously rejecting the rule in an overwhelming majority of jurisdictions.").  Interestingly, *Appling*, the case from which the majority here infer that Texas will extend to lawyers the potential liability for negligent misrepresentation, relies entirely upon cases from other states in dispensing with privity. *Appling* has to distinguish two contrary Texas appellate cases to reach its conclusion.

Judge Reavley's opinion is certainly not wrong, as it reflects a rule many other states have adopted.  The only question is whether the Texas Supreme Court, having made such a bright-line decision for privity in *Barcelo*, will cut back on it to adopt *Appling*.  I do not think these two decisions are easily reconcilable in principle, in equity, or in fact.  Thus, I am

22

wary of making the majority's *Erie*-guess that *Appling* will become governing Texas law.  I respectfully dissent.