TEXAS INSTRUMENTS, INC., Plaintiff,

v.

HYUNDAI ELECTRONICS INDUSTRIES, CO. LTD., Hyundai Electronics America, Inc., and Hyundai Semiconductor America, Inc., Defendants.

No. 2:98CV74 (TH).

United States District Court,
E.D. Texas,
Marshall Division.

Feb. 23, 1999.

Kenneth R. Adamo, Robert W. Turner, Louis Touton, Jones, Day, Reavis & Pogue, Dallas, TX, Carl L. Roth, Law Offices of Carl L. Roth, Marshall, TX, for Plaintiff.

Danny L. Williams, Terry Morgan, Williams, Amerson & Morgan, Houston, TX, T. John Ward, Brown, McCarroll & Oaks Hartline, L.L.P., Longview, TX, for Defendants.

### MEMORANDUM AND OPINION ORDER

HEARTFIELD, District Judge.

Before this Court are the following three motions:

1) *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony* (re: object code) [210];

2) *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony* (re: Dr. Reif) [217]; and

3) *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America,* *Inc.'s Motion for Leave to Supplement List of Trial Witnesses* [219].

Although this Court will address each motion, the bulk of this order concerns *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony* (re: object code) [210]. It is to this motion that the Court now turns.

### A. Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony (re: object code) [210]

#### 1. The Facts

**A. Computer Science 101—*Object Code, Source Code, and Assembly Code***

This particular lawsuit involves the alleged infringement of complicated semiconductor technology. One of the ways Texas Instruments can prove infringement of its technology by Hyundai is through "source code." Apparently, source code, such as "C" or "Basic" language, is a high-level software language that properly trained humans can understand. But computers can't use source code. So, source code must be "compiled" to "object code." Object code is comprised of a series of 1's and 0's (binary language) that properly plugged-in computers can understand. Humans can't readily understand object code; and computers can't understand source code. Obviously, communication between man and machine is not forever lost. High-level source code can be "compiled"— that is reduced to object code so that the computer can readily understand it. Conversely, computer-friendly object code can be "decompiled"—that is, transmogrified in a manner that represents human-friendly source code.[1] Decompilation must be per-

---

1. At yesterday's hearing on this motion, Hyundai's expert Miss Stevens succinctly explained the process during her cross-examination by Texas Instruments' attorney, Mr. Adamo:

    Q: [Mr. Adamo] Down here is the object code. This is what the machine actually needs—zeroes, ones, and binaries; right?

    A: [Miss Stevens] Uh-huh. Correct.

    Q: Now, If I translate the source code into the object code, I do that with something called a compiler; right?

    A: In the case that you're using, high-level language, yes, you would use a compiler.

    Q: Now, if I tried to go back in the other direction, take object and convert it back into a high-level language, that's decompilation; right?

    A: Back into high-level language, that's decompilation.

    *February 22, 1999 Hearing.*

formed while the program is not running. Is that it? That's pretty easy. Not so fast...

There is one more type of code—"assembly code." Assembly code is close to object code, but it's *not* object code. Assembly code is an intermediate form of computer code that is essentially an mnemonic of the 1's and 0's used in object code form. This assembly code mnemonic aids the user in remembering the object code's function, thereby making partially accessible to the human the otherwise inaccessible world of binary 1's and 0's.[2]

### B. Texas Instruments' Promise *Not* to Decompile Object Code and *Not* to Rely Upon Decompiled Object Code

On December 29, 1998, this Court heard Hyundai's motion to extend the trial schedule. At that hearing and in open court, counsel for Texas Instruments, Mr. Carl Roth, said Texas Instruments had not decompiled object code, would not be decompiling object code, and would not rely upon decompiled object code.

> [Mr. Roth]...The question is: Well, are you decompiling source code—excuse me—object code into source code in this case?...I've told Mr. Ward that I am unaware of TI doing what he suggests, that is, taking object code off one of these machines, running it through a decompiler like Mr. Kelly talks about in his affidavit, and spending 600 hours trying to convert it back into source code. But I'll tell them to get him off of it. *Texas Instruments is not, in this case, going to take or rely upon any source code that has been decompiled from object code that they've taken off one of these machines.* We have not taken object code off of one of these machines, which are, you know, very—it's a large amount of code—and then taken that machine code and run it back through to get source code. *You know, we didn't do it. We're not gonna rely on it.*

*Hearing Transcript: December 29, 1998* pp. 45–47 (emphasis added).

### C. Bennett's "Disassembly" of the Object Code Into Readable Assembly Language

On February 4, 1999 Hyundai[3] took the deposition of Texas Instruments' expert, Thomas C. Bennett. During that deposition, Mr. Bennett revealed that he "disassembled" some of the product's object code and relied upon that disassembled portion in formulating a program capable of testing one of the accused machines, the TEL Mark 7/8. Mr. Bennett coined this portion of his disassembly a "background investigation." Mr. Bennett explained disassembly: "A microprocessor executes a(sic) byte or multi-byte instructions, which to a human reader are very difficult to understand because they are just numbers...A disassembler translates those numbers into assembly code, which a person that's knowledgeable in assembly code can read." *Bennett Deposition* pp. 10–12. Hyundai says that Mr. Bennett actually *decompiled* object code into source code—precisely what Texas Instruments said it would *not* be doing. Moreover, cries Hyundai, Mr. Bennett actually destroyed this "decompiled" code since he dumped his initial

---

**2.** There was one *Star Trek: The Next Generation* in which a race of beings known as the "Binars" were dying because the computer that sustained their collective memory was failing. The Binars stole the Enterprise and used its computer to store their collective memory while they fixed their home planet's super-computer. After they saved their planet's super-computer, they turned the ship back over to Captain Picard and told him that they had no choice but to steal the ship. Had they asked to simply borrow the ship, there would have been a fifty-fifty chance he would have said "no" (either yes or no, 1 or 0). Captain Picard rejoined that he probably would have said "yes" (that is, there was *greater* than a fifty-fifty chance he would have said yes—more like 1 and less like 0). The Binars (object code) could not understand the humanity of Captain Picard; and Captain Picard (source code) could not understand the constraining 1-or-0 nature of the Binars. Perhaps the presence of some intermediary (assembly code) could have facilitated more efficient communication and understanding between the two.

**3.** Just as it did in its February 4, 1999 *Memorandum and Opinion Order* [195], this Court will use "Hyundai" to refer collectively to the three defendants: 1) Hyundai Electronics Industries Company, Limited, 2) Hyundai Electronics America, Incorporated, and 3) Hyundai Semiconductor America, Incorporated. Once again, for the limited purposes of this opinion, there is no need to distinguish between these three Hyundai entities.

observations during this background investigation. Since Texas Instruments failed to disclose this decompiled code to Hyundai, and since Mr. Bennett "destroyed" the results of his decompilation, he should be precluded from testifying at trial.

## 2. The Law

As it noted in *Memorandum and Opinion Order* [197] which addressed the parties' last barrage of evidentiary motions, this Court enjoys wide latitude in matters of evidence, as Provided by Federal Rule of Civil Procedure 37:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1).

■ The Court has broad discretion to make whatever rulings that are just in light of the facts of the particular case. As recited above, one of the options available is the power to preclude evidence when a party's discovery is evasive or misleading. The Court also has the power to sanction or order payment of expenses and/or attorney fees. *Id.*

■ In determining whether violation of Rule 26 requiring disclosure of evidence is harmless, such that the evidence may be used at trial despite non-disclosure, the trial court's discretion is to be guided by the consideration of four factors: (1) the importance of the evidence or witness' testimony; (2) the prejudice to the opposing party of allowing the evidence in; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness or evidence. Fed.R.Civ.P. 26(a), (e)(1), 37(c)(1); *United States v. $9,041,598.68*, 163 F.3d 238

(5th Cir.1998). The court is not required to make express findings of fact or conclusions of law concerning the existence of substantial justification or harmless failure to disclose, either by the express language of Rule 37, the Advisory Committee Notes, or Fifth Circuit case law. *Id.; see also Bradley v. United States*, 866 F.2d 120, 125 (5th Cir.1989). Such rulings by the trial court will not be disturbed on appeal absent a showing of abuse of discretion. *See Harris v. Amoco Production Co.*, 768 F.2d 669, 684 (5th Cir. 1985).

■ Furthermore, the admission or exclusion of expert testimony is a matter left to the discretion of the trial court, and will not be disturbed on appeal unless it is manifestly erroneous. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 180 (5th Cir.1995); *see also First Nat. Bank of Durant v. Trans Terra Corp. Intern.*, 142 F.3d 802 (5th Cir. 1998).

## 3. Analysis

■ What exactly was Mr. Bennett doing? Texas Instruments hired Mr. Bennett to research the behavior of the automatic water transfer in certain semiconductor fabrication equipment. Most of his time was spent studying the background of the operating system in the TEL Mark 7/8 machine.[4] This background investigation comprised initial "memory dumps." Why? Texas Instruments directed Mr. Bennett to find the "indicator" within the accused product. In order to find the indicator, Mr. Bennett had to review the memory of the computer at various stages in the operation of the TEL equipment *as it was directed by the Intel processor.* So, during this initial analysis, Mr. Bennett "dumped" memory out of the computer's non-permanent or dynamic memory, which constantly changes as the equipment operates.[5] This memory dump should

---

**4.** At the hearing it soon became apparent that the "decompiled code" that Mr. Bennett was "relying upon" (according to Hyundai) was really *disassembled* code flashing across a screen as he tried to trace the operations of the TEL Mark 7/8 machine as instructed by an Intel microprocessor.

**5.** At yesterday's hearing, Mr. Bennett testified that what he really saw was strings of instructions flashing across the screen leading him through a computer path. He paid little to no attention to each particular instruction since he was most concerned with the path the computer was taking—not the sign-posts delineating each curve. His goal was to become familiar with the

not be confused with a down-load of object code files or any files stored by the computer on disk drives, which do not change. Complete explanation of Mr. Bennett's analysis is best left to experts like Mr. Bennett. After reviewing the motions and hearing the testimony at yesterday's hearing, it is obvious to this Court that Mr. Bennett was *not* decompiling object code; he was disassembling it via emulation / memory dump analysis. During cross-examination by Texas Instruments' attorney, Mr. Adamo, Miss Stevens (Hyundai's expert) admitted that disassembly is *not* decompilation:

Q: Assembly is what you get from disassembling object code, right?

A: You do get assembly language from disassembly. That is correct.

Q: You're not decompiling it, your disassembling it; right?

A: Yes.

*February 22, 1999 Hearing.* Decompilation and disassembly are not the same thing.[6]

During the deposition of Mr. Bennett, Hyundai's attorney successfully confused the two terms—so much so that the parties presented the issue to Magistrate Judge Faulkner via a discovery "hot-line" call:

"Mr. Hemingway (Texas Instruments' deposing attorney): . . . And the second time I made a request on the record was regarding a term that has been used in a different manner as between counsel and the witness. The witness has asked counsel to define the term that he is using in a question the way counsel is using it; counsel has refused . . .

Magistrate Faulkner: Mr. Morgan [Hyundai's deposing attorney], I don't know, of course, exactly what we are talking about, but I would say that request seems certainly reasonable, that you would either define your term if you are going to use it

if there is a misunderstanding or—or difference of opinion what that term means. *That won't serve anyone's interest to—to get matching words on a deposition that then will be clarified by explaining that, no, the term was used some other way, so I think it would be to you advantage and I'm sure you would agree to get that on the record if there is any disputed terms."*

*Bennett Tr.* 87:16–97:16 (emphasis added). Despite Magistrate Faulkner's admonitions, Hyundai's deposing attorney never provided Mr. Bennett with his definition of "disassembly" as he was using it. Now, Hyundai seeks to profit off of the confusion its deposing attorney generated between the two terms. No deal.

First, this Court specifically notes that Mr. Bennett's emulation / memory dump analysis comprised only one out of five tests conducted by him. Thus, contrary to what Hyundai argues, this analysis does not form the "primary basis for Mr. Bennett's opinion, which TI uses to buttress its infringement." Second, the data supporting Mr. Bennett's testing has been produced to Hyundai both in hard copy print-outs and electronic form. Moreover, Texas Instruments maintained a valid work product objection to the production of this information *prior to* the exchange of expert reports. Third, Mr. Bennett's background investigation into the TEL Mark 7/8 machine can not support the exclusion of Professor Spanos' expert report and part of Professor Reif's expert report. For while both professors rely in part on Mr. Bennett's report, Professor Reif did not rely on the emulation / dump analysis at all and Professor Spanos only relied upon this analysis for certain '613 patent claims applied to one tool—the TEL Mark 7/8. Hyundai is trying to wipe out Texas Instruments' experts and their reports based on one background test on one tool applied to only one patent.

---

computer's entire path in order to create a program capable of studying the machine to determine if it is, indeed, and infringing machine. The results of this background investigation were, of course, produced to Hyundai.

6. In the Hyundai spirit of obfuscation, when asked if assembly code and source code were "one and the same thing," Miss Stevens testified that ". . . assembly language is a type of source

code. People write programs in assembly language. Source code is source code that the program is written in, and we've seen that in various machines that we've looked at, that they've had *both assembly code and high-level language . . . " February 22, 1999 Hearing.* Well, if they had *both,* then logically they are not the same thing.

Most important, Mr. Bennett's disassembly of object code into assembly code is not decompilation into high-level source code. Hyundai tried to confuse this distinction at Mr. Bennett's deposition. It didn't work. Now, Hyundai is trying to confuse this Court, too. "There is simply no question that TI's expert relied upon disassembled code which is defined exactly as TI's counsel defined decompiled immediately prior to denying that it had none and would not be relying upon it." [7] *Hyundai's Motion to Exclude Expert Testimony* [210] 8. Hyundai represents to this Court that Mr. Bennett's assembly code was really decompiled source code *as counsel for Texas Instruments defined it* at a prior hearing. Well, Texas Instruments' counsel was talking about *decompiled object code*—not disassembled object code.[8] However, in its response, Texas Instruments shows how, in fact, the two are not the same. This Court notes that nowhere in its motion does Hyundai define assembly code. Rather, it represents to this Court that Mr. Bennett's disassembly is decompilation. Assuming, *arguendo*, that Mr. Bennett mistakenly made a reference to decompilation during his explanation of disassembly, it is a direct result of obfuscation by Hyundai's deposing attorney. The words "decompile" and "decompilation" appear no where in Mr. Bennett's deposition. Hyundai

attempts to read these words into the deposition despite their conspicuous absence.[9] It's not decompiled object code and Hyundai knows it.

A little over a month ago in its *Memorandum and Opinion Order* on the license issue, this Court wrote: "Candor and accuracy are endangered species at hearings; it is nice to know that occasionally these curious beasts roam an environment that so desperately needs them." [10] *Memorandum and Opinion Order* [195] 48. Well, these curious beasts are nowhere to be found in this particular motion. Hyundai is trying to pull one over on this Court. It bets that this Court won't be able to bring into focus the blurring of object code, assembly code, and source code (regardless who initially blurred it).[11] And if this Court can not comprehend the difference between the three, then it will never be able to see that Mr. Bennett's emulation / dump analysis is merely a random and partial trace of dynamic computer instructions delivered in an order corresponding to the state of the data and operations being performed by the equipment *as directed by the Intel microprocessor.* As part of his background analysis of the TEL Mark 7/8 machine, Mr. Bennett needed to know at a particular time during the operation of the equipment, what instruction the *microprocessor* was performing as

---

7. In this particular motion, Hyundai (inferentially) accuses counsel for Texas Instruments, Mr. Roth, of lying to this Court and to Hyundai since he vowed Texas Instruments would *not* decompile object code. This Court has extensively relied upon the consistent candor and accuracy of both parties' local attorneys throughout this complicated litigation. Granted, disassembly may smell like decompilation, but it is, in fact, *not* decompilation. With trial of this matter less than two weeks away, this Court will not take the time to determine which party *initially* blurred the line between disassembly and decompilation (nonetheless, Hyundai expeditiously moved on this blur). However, if such obfuscation happens again, this Court will set a hearing (at *its* convenience), hire (at the parties' expense) independent experts on semiconductor technology, and find the party responsible for the *initial* confusion. This case is only one out of seven cases before this Court. Each case involves complicated technology with esoteric terms capable of being twisted for unfair advantage. It will not happen again.

8. Whether or not the attorneys were on the same wave-length at that point is not for current dis-

cussion. The record indicates Texas Instruments' attorney referencing decompiled object code and not *disassembled* code. This Court recognizes the ability of both Texas Instruments and Hyundai to confuse such esoteric nomenclature to their advantage. Where did the confusion in this particular instance begin? Who started it? This Court has no idea. It only knows that now Hyundai is moving to gain from the confusion.

9. Sound familiar?

10. Ironically, the compliment was paid to Hyundai at the summary judgment hearing on the license issue.

11. Nowhere in its motion does Hyundai define assembly code. Rather, it just unilaterally equates assembly code with decompiled object code. Moreover, despite Magistrate Faulkner's admonitions, Hyundai's counsel never defined "disassembly" as he was using it (for obvious reasons).

*Intel,* the manufacturer of the microprocessor—not TEL, the manufacturer of the equipment—defined that instruction. Mr. Bennett was not decompiling the unreadable binary 1's and 0's back into the original source code programming language used by the TEL engineers when they designed the equipment. Simply put, he was not decompiling object code.

**B. Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony (re: (Dr. Reif) [217])**

### 1. Facts

One of Texas Instruments' experts, Dr. Rafael Reif, observed the operation of accused equipment in a "clean room" environment of various wafer fabrication facilities.[12] On January 28, 1999, Hyundai took Dr. Reif's deposition. At the deposition, Dr. Reif revealed that while observing the equipment he scribbled some illegible notes that he later threw away. Dr. Reif also revealed that he reviewed a videotape of DNS equipment in operation. Hyundai accuses Dr. Reif (and Texas Instruments' attorneys) of spoliation and seeks to strike his testimony since it will never know what was those scribblings said. Furthermore, Hyundai accuses Dr. Reif (and Texas Instruments' attorneys) of hiding this DNS tape from Hyundai. Since Dr. Reif and Texas Instruments spoliated evidence (the scribblings) and withheld disclosure of the DNS videotape, Hyundai urges this Court to preclude Dr. Reif from testifying at trial and strike his expert report.

### 2. Law

See page 416 of this opinion.

### 3. Analysis

■ This motion is absolutely ridiculous. Hyundai has, once again, excerpted portions of one of Texas Instruments' experts and twisted his words—this time, to bolster a less

than frivolous motion. As for the scribbled notes, it appears Hyundai's deposing attorney chose not to listen to Dr. Reif's explanation at his deposition. Well hear ye, hear ye, Hyundai. Dr. Reif himself testified:

> Hyundai's Attorney: Did you destroy any of those [clean room] notes?
>
> Dr. Reif: Some of them were really useless after I saw Tom Bennett's notes or analyses that were much more complete than the scribbles that I could write so I just threw them away....
>
> Hyundai's Attorney: You're saying you do not have all the notes?
>
> Dr. Reif: **All the notes that I made, no. It's very hard to scribble things in clean rooms. It's just not easy to write. So some of those notes were not that legible and were easily replaced by the information that I got from Tom Bennett...**

*Reif Deposition, January 28, 1999 Deposition Transcript* 56–57. Dr. Reif did not "consider" the discarded information in forming the opinions stated in his report. There is no obligation to turn over this illegible, unrelied-upon data under Rule 26(a)(2)(B). Besides, how could he rely on these scribblings? Most of them were illegible.[13] Moreover, he threw them away and relied upon Mr. Bennett's (more legible) notes which have obviously been produced to Hyundai. Finally, Texas Instruments produced the notes *that Dr. Reif retained and relied upon* at the second day of his deposition. Dr. Reif's "spoliation" of these scribbles is, at best, proof of his desire to conceal poor penmanship through tidiness.

Hyundai's charge that Dr. Reif and Texas Instruments hid the DNS videotape is yet another result of Hyundai's partial excerpting, zig-zagging, and meandering through Texas Instruments' expert's deposition.[14] Dr. Reif testified: "I cannot recall seeing any other videotape besides the Oregon plant and the ones on the DNS or the one on the

---

**12.** Apparently, a "clean room" is a room where human visitors view high-tech machines. In order to protect the sensitive equipment, the visitors wear bulky suits, gloves, and helmets.

**13.** The product of Dr. Reif's "note-taking" would be the equivalent of someone wearing an astronaut's suit and writing on a post-it note with a Putt–Putt pencil.

**14.** Sound familiar, again?

DNS." *Id.* He testified that he was "at the Jones, Day office" when he reviewed the DNS videotape. *Id.* Granted, it is not crystal clear, but it is apparent to this Court that Dr. Reif was referring to two tapes from the inspection of Hyundai's Eugene, Oregon facility—both of which were produced to Hyundai's counsel *prior to* the filing of Dr. Reif's expert report.[15] In fact, the videotape footage referenced by Dr. Reif was taken in the presence of Hyundai's attorneys. Where there's no smoke, there's no fire. Here, Hyundai is trying to twist deposition testimony to generate smoke.

### C. Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion for Leave to Supplement List of Trial Witnesses [219]

The Court GRANTS this motion. Hyundai may supplement its list of trial witnesses to include Mr. Arnold E. Gustafson. Texas Instruments may depose Mr. Gustafson at a time convenient to Texas Instruments. The deposition testimony shall include matters related to his "log book" on Sundstrand / Ingersoll–Rand System.

### D. Hyundai's Conduct

In its *Memorandum and Opinion Order* [195] delivered February 4, 1999, this Court quoted and adopted one of Texas Instruments' attorney's positions regarding Hyundai's briefing:

> At the "Evidentiary Hearing" held before this Court on February 4, 1999, counsel for Texas Instruments, Mr. Kenneth Adamo, succinctly described the trouble with Hyundai's various arguments it levies to support its "TI Country Concept" interpretation of the License Agreement: "... Hyundai's license defense, to try to figure

---

**15.** Indeed, Hyundai made no attempt to contact Texas Instruments to discuss the video-tape confusion. Rather, it simply filed a motion and requested expedited consideration which, relying upon Hyundai's good faith, this Court granted.

**16.** Civil Action No. 1:98–cv–15 had its final pretrial conference the morning of the hearing on these motions; jury selection begins today. This Court squeezed Hyundai's hearing between the

out what the defense has been, when, and what the parameters are, if I can use an expression from my childhood, has been like trying to nail Jell–O to a wall." *Transcript of Evidentiary Hearing* at 89. This Court has felt similar frustration throughout Hyundai's briefing and motions...

*Memorandum and Opinion Order* [154] 58. Hyundai now hurls another load of jello at this Court. Moreover, it moved this Court for expedited consideration of these squishy, evidentiary motions. This Court granted expedited consideration despite its need to begin a civil trial in another matter in Beaumont.[16]

Although the "object code" confusion (regardless who is responsible) led to a meritorious motion, Hyundai's weak motion to strike Dr. Reif for the missing "scribbles" prompts this Court to briefly review Hyundai's conduct throughout this litigation. First, on September 11, 1998, this Court entered a "Discovery Order" reminding the parties of their obligations under the Local Rule CV–26 and its initial disclosure requirements. Although this Court politely directed it to both parties, it was, in fact, mostly directed at Hyundai's recalcitrant attitude toward this Court's local rules requiring automatic disclosure *regardless of the pendency of "motions to dismiss, to remand or to change venue." Local Rule CV-(C)(4)* (emphasis added). Despite Hyundai's thumbing of its nose at this Court's local rules and automatic disclosure, this Court gave Hyundai the benefit of the doubt. Then, Hyundai's motions for delay came pouring in: Hyundai filed a motion to stay pending the outcome of its New York action; Hyundai filed a motion to stay pending the decision by the Judicial Panel of Multidistrict Litigation; and Hyundai filed a motion to transfer venue to the Northern District of Texas, Dallas

---

two. This Court specifically notes that, due to the timing of Hyundai's motions, Texas Instruments and this Court were required to work through the week-end (and into the wee hours of Monday morning) in order to expeditiously respond to Hyundai's evidentiary motions (Of course, this Court doesn't mind working over week-ends when the motions are meritorious).

Division pursuant to 28 U.S.C. § 1404(a).[17] Texas Instruments said all of this was for delay. But, once again, this Court gave Hyundai the benefit of the doubt and addressed the motions as good-faith arguments presented by a candid party. This Court denied all of Hyundai's motions; and (as Hyundai's patent attorney threatened) the bulk of the Texas Instruments and Hyundai litigation related to the license issue began to trickle, and then flow, into this Court.

Hyundai used the co-pending cases in other jurisdictions to foster delay. Hyundai was literally thrown out of the New York court for its recalcitrance toward that court's orders. In London, England, the court stripped Hyundai of its counterclaims for similar recalcitrance. The MDL court refused to consolidate all of these cases. So, eventually, this Court got most of the United States' cases between the parties. This *de facto* consolidation stripped Hyundai of its ability to foster delay by obfuscating the logistics of co-pending cases through multiple motions to stay, motions to transfer, and motions to consolidate—all hurled in multiple courts. This Court quietly refused to paint Hyundai as a party bent on delay through confusion. Now confined to a single Court, Hyundai's dilatory efforts are magnified since they are no longer spread across the nation. The time has come for this Court to break its self-imposed silence: Hyundai is a party bent on delay through obfuscation. Worse, Hyundai's methods have devolved into old-fashioned tactics of taking complicated nomenclature, confusing witnesses through vaguely defined terms, excerpting out of context the product of that confusion, and trying to mislead this Court.[18] Hyundai is using the complicated nomenclature of semiconductor technology and the destruction of illegible scribbles to generate confusion to generate motions for delay, motions for delay, motions for delay.[19]

Save for a single excerpt from the New York court's order of dismissal, this Court has remained virtually silent as to Hyundai's conduct in other courts in this nation and around the world. Well, no more. Texas Instruments is not completely innocent throughout all of this, particularly when it comes to discovery and disclosure.[20] Now,

---

**17.** After becoming familiar with the issues and the parties involved in the Texas Instruments and Hyundai litigation, the Court now sees the true purpose behind Hyundai's motion to transfer to Dallas, Texas. Granted, Texas Instruments is headquartered in Dallas; but Texas Instruments chose Marshall, Texas to file this particular lawsuit. Other than the usual "big airport there [transferee city], no airport here [Marshall, Texas]" argument constantly levied in this Court, the Korean corporation really had no other reason for being in Dallas, Texas. Indeed, it is odd that Hyundai (a *Korean* corporation) would move this Court to put *Texas* Instruments (a Delaware corporation headquartered in *Dallas, Texas*) back into its "home turf" of *Dallas, Texas*, unless, of course, Hyundai was disenchanted with the prospect of actually going to trial via this Court's "notoriously rapid" docket.

**18.** Take, for example, Hyundai's conduct in filing its motion to exclude Dr. Reif's testimony based on a videotape and scribbles that he did not rely upon and threw away shortly after viewing the fabrication facility equipment. Hyundai took Dr. Reif's deposition on January 28, 1999, whereupon it learned of the scribbles Dr. Reif threw away and the videotape. Hyundai waited until last week to whine about this. Dr. Reif is currently out of the country and could not be reached by Texas Instruments in time for yesterday's hearing since this Court, giving Hyundai the benefit of the doubt, granted expedited consideration of these motions. How convenient for Hyundai.

**19.** "Delay" since the parties (not to mention this Court) should be spending time preparing for trial—not drafting and ruling on weak evidentiary motions. Moreover, this Court notes that it recently permitted additional discovery beyond its deadlines. Thus, the parties' litigation teams literally have their hands full. Every time a motion is filed, it's one less lawyer or team of lawyers capable of preparing for trial.

**20.** Granted, this Court understands that patent litigation is super-secretive and hotly contested. But, you know, it's not like we're dealing with recent graduates of law school, here. Both Texas Instruments and Hyundai have assembled crack litigation teams from some of the leading firms in the nation. These litigation teams literally span the country: from California to Cleveland, Marshall to New York (this Court couldn't find another "M" city). This Court's musings on the parties' litigation tactics should not be mistakenly imparted to the parties' local counsel. Theodore Roosevelt once said: "It is not the critic who counts, not the man who points out how the strong man stumbled, or where the doers of deeds could have done them better. *The credit belongs to the man who is actually in the arena: whose face is marred by the dust and sweat and blood...*" Although this Court's blows to

Hyundai tries to use the esoteric nomenclature of semiconductor equipment analyses to twist definitions, confuse witnesses, mislead this Court, and win itself wholesale exclusion of Texas Instruments' experts and their reports.[21]

Well Hyundai, try to excerpt, re-define, and confuse this:

THIS COURT DENIES *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony* (re: object code) [210].

ALSO, THIS COURT DENIES *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion to Exclude Expert Testimony* (re: Dr. Reif) [217].[22]

It is SO ORDERED.

---

the parties may appear to fall on the parties' lead counsel, it in fact is directed toward the parties and their litigation teams, who are conspicuous by their absence.

**21.** Hyundai's twisting, zig-zagging, and meandering method is best exemplified in its tortured interpretation of the parties' License Agreement.

**22.** Once again, this Court GRANTS *Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Inc. and Hyundai Semiconductor America, Inc.'s Motion for Leave to Supplement List of Trial Witnesses* [219].